**NATIONAL CABLE TELEVISION AS-SOCIATION, INC., Appellant,**

v.

**FEDERAL COMMUNICATIONS COMMISSION.**

No. 24786.

United States Court of Appeals, District of Columbia Circuit.

Argued June 13, 1972.

Decided April 17, 1973.

Charles S. Walsh, Washington, D. C., with whom Gary L. Christensen, Washington, D. C., was on the brief, for appellant.

Leonard Schaitman, Atty., Dept. of Justice, with whom L. Patrick Gray, III, Asst. Atty. Gen., at the time the brief was filed, Thomas A. Flannery, U. S. Atty., at the time the brief was filed, and Walter H. Fleischer, Atty., Dept. of Justice, were on the brief, for appellee. Richard E. Wiley, Gen. Counsel, F. C. C. at the time the record was filed, John H. Conlin, Associate Gen. Counsel, F. C. C.,

and Robert V. Zener, Atty., Dept. of Justice, also entered an appearance for appellee.

Before BAZELON, Chief Judge, ROBINSON, Circuit Judge, and WILLIAM J. JAMESON,* Senior U. S. District Judge for the District of Montana.

BAZELON, Chief Judge:

This appeal involves the meaning of the requirement under the Freedom of Information Act that documents be "identifiable" before disclosure is required.[1] On March 2, 1970, the National Cable Television Association (NCTA) requested that the Federal Communications Commission allow inspection of several classes of documents that related to a proposed Commission rulemaking. When the Commission refused, the NCTA brought this suit in the District Court for a stay of the rulemaking and for an order to produce the documents.

Immediately before the hearing for preliminary relief in the District Court, but after the period allowed by the Commission for comments on the rules, the Commission filed a motion and memorandum alleging that "circumstances" had changed, proffering a number of the documents theretofore denied, and requesting dismissal or summary judgment.

The District Court denied the motion for preliminary relief and no appeal was noted.[2] It held two hearings, received testimony from Commission

---

* Sitting by designation pursuant to Title 28, U.S.C. § 294(d).

1. The Freedom of Information Act, 5 U.S.C. § 552 (1970), requires that each agency publish or make available certain classes of information. *Id.* § 552(a)(1)(2). All other information covered by the Act must be available for inspection in accordance with § 552(a)(3), which states:

 [E]ach agency, on request for identifiable records made in accordance with published rules stating the time, place, fees to the extent authorized by statute, and procedure to be followed, shall make the records promptly available to any person.

2. To justify a stay of an agency proceeding pending the litigation of a Freedom of Information Act request, a probability of irreparable injury must be shown. *See* Bannercraft Clothing Co. v. Renegotiation Board, 151 U.S.App.D.C. 174, 466 F.2d 345 (1972); Sears, Roebuck & Co. v. NLRB, 153 U.S.App.D.C. 380, 473 F. 2d 91 (1972). The District Court found that the NCTA had presented "no probative evidence" of such a probability.

 The rules were subsequently adopted on July 1, 1970, 35 Fed.Reg. 10,988, and

staff members, and granted summary judgment for the Commission on the following oral statement:

> To me, what you are seeking are the work papers and internal memoranda of this agency to which I do not believe you are entitled. What you want are the tapes, the yellow work sheets and possibly to pick somebody's brain. I do not think you have made out a case.[3]

 We reverse. Summary judgment may be granted only if the moving party proves that no substantial and material facts are in dispute and that he is entitled to judgment as a matter of law.[4] To prevail, the defending agency must prove that each document that falls within the class requested either has been produced, is unidentifiable, or is wholly exempt from the Act's inspection requirements.

Measured against this requirement, summary judgment was improper. Some of the facts necessary to the Commission's defenses find no support in the evidence and others of those facts are directly contradicted by evidence elicited by the NCTA.

## I. The Rulemaking Proceeding

On February 19, 1970, the Federal Communications Commission released a Notice of Proposed Rule Making which set forth an alteration—and substantial increase—in its license "fee schedule."[5] The February Notice proposed extension of fees beyond applicants for licenses to also include operators of community antenna television (CATV) systems and users of the Commission's radio frequency equipment testing services. It also proposed that the fees, which had previously been designed to reimburse the government for twenty-five percent of the Commission's budget, be raised approximately three hundred percent, thus making the Commission self-supporting.

The result was a predictable storm of protest. At first directed at the Commission's power to impose the fees, the attack eventually shifted to the way in which the proposed scheme would allocate the costs of regulation among the regulated industries and their constituent members. In response to the latter, the Commission issued a Supplemental Notice in March of 1970.[6] The March Notice purported to provide a breakdown of the costs of operating the Commission into the cost of operating each of its six major offices and bureaus.

Taken together, the February and March notices asserted that the proposed schedule would assess each Commission-regulated industry in accordance with a formula that may be briefly described. The cost of operating each office with direct responsibility for regulating an industry was computed. Next, that part of the cost of each office without a direct regulatory responsibility that could be directly traced to a particular industry was charged to that industry. Then all remaining costs were lumped together and each was assigned a share of that cost equal to its percentage share of the directly assigned costs. Finally, the sum of these items, called the "cost factor," was adjusted to reflect certain intangibles, such as the "value to the recipient" of the privileges granted it by the Commission.[7]

---

were upheld on review, Clay Broadcasting Corp. v. FCC, 464 F.2d 1313 (5th Cir. 1972). That, of course, does not affect the NCTA's claim, for the Act requires that the materials be made available to "any person."

3. Joint Appendix 233.

4. See Semaan v. Mumford, 118 U.S.App. D.C. 282, 335 F.2d 704 (1964).

5. Notice of Proposed Rule Making, No. 18,802, 35 Fed.Reg. 3815 (February 18, 1970).

6. Supplemental Notice, No. 18,802, 23 F.C.C.2d 183 (March 4, 1970).

7. The Commission relied on title V, Independent Offices Appropriations Act of 1952, 31 U.S.C. § 483a (1970), as its authority for applying this formula.

After setting forth this generalized explanation of its approach, however, the Commission failed to supply specifics, either as to the facts from which it had reasoned or as to the mechanical steps it had taken in deriving the final schedule.[8]

Without data concerning the Commission's costs, it is not possible to determine the basis upon which the Commission allocated its direct and indirect costs among the regulated industries. Without disclosure of the final amount the Commission intended to recover from each industry, it is not possible to determine what, if any, noncost adjustments were made and whether the final schedule had any relation to the cost allocation. And without a definition and quantification of "value to the recipient"[9] it is not possible to determine why and how the Commission might be deviating from a pure system of cost allocation. Thus, the Commission insulated itelf from external criticism of its method and rationale, leaving nothing open to challenge except the legality of its result.

The NCTA, as the chief trade association of the CATV industry, wished to file comments concerning the proposed fee schedule. Faced with the opaque notices just described, it requested an opportunity to inspect several categories of documents that the NCTA believed the Commission would have in its files.[10] One category was "the documents, listings and records used to determine the ' "value to the recipient" of the privileges granted' as referred to in the [February] *Notice*." The other catego-

---

That statute states the sense of Congress that any thing of value granted by any federal agency should be self-sustaining, and authorizes agency heads to promulgate regulations to that end. The regulations are "to be fair and equitable, taking into consideration direct and indirect cost to the Government, value to the recipient, public policy or interest served, and other pertinent facts." *Id.*

8. The notices did provide a sketch of the general approach that the Commission followed with respect to each industry and the mechanics of fee collection. Notice of Proposed Rule Making, No. 18,802, 35 Fed.Reg. 3815, ¶¶ 9–14 (February 18, 1970).

9. This factor could mean a variety of things. The Commission, in its February Notice, stated:

We have therefore selected different bases for considering "value to the recipient," both for different types of actions within each service and similar types of action among different services, which we believe are fair and equitable. We fully recognize that the factors we have used may not wholly or precisely reflect "value to the recipient." But such precision or accuracy is not required since our proposed fee schedule need only reflect some consideration of "value to the recipient," and our proposed fees, in total, fall far short of the total value of Commission licenses, grants and authorizations computed by any standard.

The Commission made no attempt to set out its interpretation of this term, or to specify what monetary adjustments resulted from its use.

10. The original letter requested "the annual and inventory reports of all user charges of the Commission submitted to the Bureau of the Budget on Standard Form No. 4 on or about September 30, 1969," the documents "used to prepare the Standard Form No. 4, report," the "Commission's budgetary *request* for fiscal year 1970, beginning July 1, 1970, *which was submitted to the current sessions of Congress*," including supportive documents," and "the Commission's budgetary requests for fiscal years 1970, . . ., and 1969." The italicized language manifests the NCTA's ignorance of internal Commission proceedings discussed below. *See* text following note 13 *infra*.

Finally, the letter stated generally:

NCTA also requests the right to inspect documents used by the Commission in determining the proposed fee schedules set forth in the Notice of Proposed Rule Making . . . . In particular, NCTA requests the right to inspect the documents and the listings or records used to determine the " 'value to the recipient' of the privileges granted" and "the direct and indirect cost to the Government" of granting and administering those privileges as referred to in paragraph 5 of the Notice of Proposed Rule Making . . . ."
Joint Appendix 49–51.

ries all related to the facts and reasons that supported the "cost factor."

## II. The Documents Sought by the NCTA

As a consequence of the Commission's midnight production of most of the requested materials, after the close of the rulemaking but prior to the first hearing in the District Court, only three of the categories remained to be considered by the Court.[11] Since the District Court's ruling does not indicate the grounds on which it based its grant of summary judgment, we must examine the record on each of these categories.

### A. The Two "Cost Factor" Categories

The February Notice stated that the total cost of regulation was that stated in the Commission's budget for the relevant year.[12] Thus, the NCTA's request to inspect documents was phrased in terms of classes of documents that supported the budget and the allocation of budgeted costs among the regulated industries. The first two categories requested were:

1. The supportive documents used to arrive at the Commission's budget for fiscal year 1971;

2. The documents, listings and records used to determine the "direct and indirect cost to the Government" of the privileges granted the CATV industry for fiscal year 1971.[13]

Access to the first group of documents would permit the NCTA to check the ac-curacy of the Commission's breakdown of its costs. Access to the second would enable it to determine which parts of the budget had been assigned to the cost of CATV regulation, and compare them with the budget breakdown to determine whether all of the costs assigned to CATV were consistent with the budget. By adding together the costs listed under the second category, the NCTA would be able to challenge both the fairness of the charge and the accuracy of the Commission's addition.

In response to the first item, the Commission provided the NCTA with a copy of its budget "request," a document prepared for the Bureau of the Budget. The "request" itemized the Commission's proposed expenditures for fiscal year 1971, but requested fifty percent more money than the Bureau finally cleared for submission to Congress as the "budget." The Commission produced nothing in response to the second item.

At the hearing in the District Court, the Commission produced the head of its budget office for examination by the NCTA. Asked for an explanation of the Commission's procedures, he testified that he had prepared the budget "request" from a variety of documents submitted by the Commission's various organizational units, in accordance with a memorandum of instruction from the Commission itself. He further testified that these documents were still in the possession of the Commission, but he

11. The Commission's administrative processing of the NCTA's request deserves some comment. Although the right to inspect documents is not dependent on need, the speed of the agency's response may drastically affect the requesting party's ability to participate in a pending agency proceeding. In the context of a 30-day comment period related to a rulemaking proceeding, the Act's requirement that production be "prompt" becomes critical.

The Commission, however, took approximately 23 days to issue a total refusal. Moreover, it relied in part on a claim that some of the documents were the property of the Bureau of the Budget, yet it violated its own regulations mandating that in such a case the request be forwarded to the appropriate agency. *See* 47 C.F.R. § 0.451(b)(3) (1972).

We find all of this particularly troublesome in view of the fact that the Commission produced the documents requested in a majority of the NCTA's categories before moving for summary judgment.

12. Notice of Proposed Rule Making, No. 18,802, 35 Fed.Reg. 3815, ¶ 3 (February 18, 1970).

13. *See* Letter of March 2, 1970, from Gary L. Christensen to Max D. Paglin, Executive Director, F.C.C., at Joint Appendix 49.

argued that these were not "supporting" documents to the final budget, apparently on the theory that the budget "request" had intervened. The latter, he said, "is really the supportive document" for the Congressional budget.

■ The second request was for the documents that supported the assignment of part of the Commission's budgeted costs to CATV. The Commission's witness testified that there were no such documents. He said that he had compiled the relevant data from the budget by using yellow sheets of paper and adding machine tapes, and had preserved only the final totals. These, he testified, were the figures included in the March Notice. The NCTA avowed that it could not duplicate the Commission's figures by this means. While we can sympathize with this statement, for the reason that there appear to be contradictions in this account of the Commission's procedures,[14] we think that the Commission has adequately shown that there exist no documents in the category specified in the second request.

### B. The "Value to the Recipient" Category

The Commission produced the official who had originally refused the NCTA's request for inspection to testify on the request for "documents, listings and records used to determine the 'value to the recipient' of the privileges granted" by the Commission. Adhering generally to the affidavit he had filed in support of the motion for summary judgment, this witness testified that the Commission itself, after receiving from its budget office a figure for the total "cost factor" for each industry, worked from this to obtain the fee schedule by taking account of statutorily designated factors, including "value to the recipient."

He stated that, as set forth in his letter to the NCTA on behalf of the Commission, the Commission had relied upon "the knowledge and financial aspects of the communications industry acquired over the years from vast numbers of confidential financial statements, confidential staff memoranda, and various trade publications." While asserting that the Commission had only relied on them "in part" for its noncost adjustments, he did testify that the Commission still had these documents. He added that the NCTA had been denied them because the request "was so indefinite that it was difficult to identify and assemble without totally unreasonable expenditure of Commission manpower." Also, he said, some of the documents were confidential. Elaborating with respect to the internal memoranda, he said:

[Q. W]ith respect to the approach taken, the degree used, is there a conclusion reached [in the memoranda] as to the approach as to the degree of value with respect to the CATV industry, all of them mentioned in the Commission's rule making proposal? Were any factual conclusions reached that were put on paper?

A. It's very difficult to distinguish between actual conclusions and an opinion of the writer, an advocacy of a certain point of view. This is a very sensitive program and there were some very strongly held views amongst the staff and amongst the Commissioners; and *these internal staff memoranda contain these views and these advocacies.*[15]

This explanation seems inadequate because the March Notice included separate amounts for the operation of offices not directly responsible for regulating any particular industry. This seems to indicate that the $1,145,400 excluded unassigned costs.

14. One Commission witness testified that the direct costs of CATV regulation were $678,000, and that CATV had been assessed no indirect costs. The March Notice, however, stated that the costs directly and indirectly attributable to CATV regulation amounted to $1,145,400. The witness explained that the latter figure also included CATV's share of unassigned costs.

15. Joint Appendix 217 (emphasis added).

Insofar as the NCTA's request went to the trade publications and the "confidential financial statements," no further testimony was taken. Since the witness had testified that no "financial statements" had been received from the CATV industry, it is possible that the NCTA does not want to inspect them. Indeed, the Commission's affidavit broadly asserted that CATV is "NCTA's sole concern"—although this could either be a representation of NCTA's position or a claim, contrary to the Act, that NCTA needed a more direct interest to support a right to inspection.

But, since the NCTA could hardly comment on the adjustments for "value to the recipient" without knowing the comparative status of other assessed industries, the NCTA's request seems more likely to encompass all of the Commission's supporting documents. And, since the actual wording of the request included all of the documents, the question whether they must be produced remains.

## III. Disposition by Summary Judgment

In response to the Commission's motion for summary judgment, the District Court ordered the Commission to produce witnesses who could testify concerning the Commission's procedures and whether documents existed within the categories requested by the NCTA. It then required the NCTA to examine those witnesses, identify the documents it sought, and show that they were not exempt.

█ We think this procedure was based on an erroneous construction of the Act's requirements. The Commission could not rest on the blanket allegations of compliance, unidentifiability, and exemption that it made in its motion for summary judgment and supporting affidavit. Nor did the testimo-

ny elicited by the NCTA supply the missing evidence. Rather, it further undercut the Commission's position.

The motion for summary judgment should have been denied, and the Commission should have been required to go on and prove the missing elements of its defenses as set forth below. On remand this can be done either in support of a renewed motion or at a trial.

### A. Identifiable Records

Apparently ignorant of the Commission's internal operations and filing system, the NCTA identified the requested documents in terms of the functions they had served in the Commission's development of the proposed fee schedule. Thus, before the Commission could comply with the request, it would have to identify the documents more specifically, as, for example, by name and file number. To do this the Commission would have to retrace the steps taken in the development of the rulemaking notice. The Commission has steadfastly refused to undertake this task, and the ruling of the District Court upheld this refusal.

█ The Freedom of Information Act does not require that a person identify records by providing the agency with a complete description down to the last detail of title and file number. It states:

[E]ach agency, on request for *identifiable* records made in accordance with published rules stating the time, place, fees to the extent authorized by statute, and procedure to be followed, shall make the records promptly available to any person.[16]

This language places part of the responsibility for identifying the records on the agency itself. The responsibility of the person requesting the records is that he provide sufficient information to permit the agency to accomplish this duty.[17] Problems of construction arise

---

16. 5 U.S.C. § 552(a)(3) (1970).

17. The Commission relies heavily on a phrase in the Senate Report that states that the records "must be identifiable *by the person requesting them.*" S.Rep. No.

813, 89th Cong., 1st Sess. 8 (1965). (emphasis added).

The context in which the phrase appears destroys any support these words appear to provide for the Commission's

when we attempt to determine how much effort the requesting party must make, and how much he may leave to the agency, realizing always that he may be required to reimburse the agency for its efforts.[18]

The legislative history provides us little added guidance, suggesting only that we look to our decisions construing the discovery rules applicable in civil cases and advising that, while requests must be "reasonably identifiable," the requirement should not be used as a device to withhold records.[19]

Our earlier cases have taken a pragmatic approach to this problem, attempting to draw lines that comport with the overall purposes of the Act.[20] We think our opinion in Bristol-Myers v. F. T. C.[21] is controlling in this case. Additionally, it provides guidance in any attempt to articulate more generally the balance to be struck in cases involving attempts to inspect agency documents used to formulate proposed or final rules.

In *Bristol-Myers* the District Court refused to enter an order compelling the Federal Trade Commission to produce documents described and identified by the Company in terms of the function that they served in the development of proposed rules regulating the advertisement of certain drugs. The basis for that ruling was a narrow interpretation of the identifiability requirement in the Act:

An identifiable record necessarily means a record that is described with sufficient precision in order that by ministerial action of some subordinate the document can be identified and selected out of the files. It does not mean that the head of an agency or his immediate assistant must use judgment in seeking through the file to determine whether a particular document is within the classification asked for. That would be an unreasonable request.[22]

We reversed, and pointed out:

The F.T.C. can hardly claim that it was unable to ascertain which documents were sought by Bristol-Myers. The Commission relied on certain materials in promulgating its proposed rule, and referred to them in announcing the rulemaking proceeding. These materials are adequately identified in

---

argument that it has no independent responsibility to identify the documents. The full statement is: "The records must be identifiable by the person requesting them, *i. e., a reasonable description enabling the Government employee to locate the requested records.* This requirement of identification is not to be used as a method of withholding records." *Id.* (emphasis added).

18. *See* 5 U.S.C. § 552(a)(3) (1970). The NCTA stated that it was prepared to pay such costs in its initial letter of March 2, 1970. *See* Joint Appendix 51.

19. *See* S.Rep. No. 813, 89th Cong., Sess. 8 (1965).
 The legislative history indicates that the standards to be applied should correspond generally to the discovery rules applicable to civil suits in the District Courts. *See id.* The 1970 amendments to Rule 33, Fed.R.Civil Proc., are instructive in this regard. They establish an alternate procedure for answering interrogatories that require the responding party to examine its own records. The responding party now may make the

records available for inspection instead of searching out the information himself.
 But this rule does not exempt the responding party from all responsibility for identifying documents in his own files. Only if the requesting party can perform that task with equal facility can he be required to cull the responding party's files. In all other cases, even when identification requires the creation of new classes, the responding party must do it. *See* Budget Rent-A-Car of Missouri, Inc. v. Hertz Corp., 55 F.R.D. 354 (1972); 4A Moore, Federal Practice & Procedure, Advisory Committee Note, Amended Rule 33, ¶ 33.01[6], at 33–13 (1971).

20. *See, e. g.,* Soucie v. David, 145 U.S. App.D.C. 144, 448 F.2d 1067 (1971). Aside from its general purpose of maximizing disclosure, however, the statute adds little help in determining the meaning of "identifiable."

21. 138 U.S.App.D.C. 22, 424 F.2d 935 (1970).

22. 284 F.Supp. 745, 747 (D.D.C. 1968).

the request for disclosure of the items mentioned in the Commission's Notice.[23]

The Federal Communications. Commission now argues, as it did in its motion for summary judgment, that this language is inapplicable in the case before us for the reason that it did not "rely on" or "refer to" any documents in its February and March notices, but to its "knowledge" acquired from documents.[24]

We think that the Commission misreads both our opinion in *Bristol-Myers* and the underlying purpose of our holding there. We did not impose a requirement that the notice directly refer to or rely on the documents to be disclosed. In fact, the request in *Bristol-Myers* did not differ from the request involved here:

> The petition filed by Bristol-Myers with the F.T.C. sought the identification and disclosure of "each item of material, whatever its form or nature, which . . . has contributed to or constitutes" the "extensive staff investigation," "accumulated experience," "available studies and reports" and "other things" referred to in the [Federal Trade] Commission's Notice [of proposed rulemaking.] [25]

The scope of the agency's responsibility to identify its own documents may be further delineated by examining a second request by Bristol-Myers, one which we said might present a plausible claim of unidentifiability by the Federal Trade Commission:

> The petition also sought each item which has contributed to or constitutes information concerning the effect of any analgesic and information concerning the accuracy of appellant's

assertions concerning the effects of various ingredients of its own analgesic products.[26]

This request undoubtedly extended beyond the documents that the F.T.C. itself possessed. Moreover, it was not apparent that the Commission had at any time either indexed its files in a way that would enable it to locate what it did have, or that it had ever brought the materials together for a common purpose or otherwise acted on them as a group. Thus, the requested documents could not be identified by retracing a path already trodden. It would have required a wholly new enterprise, potentially requiring a search of every file in the possession of the agency.

█ Once the request has been made as specific as the agency's public statements permit, *Bristol-Myers* teaches: (1) If the agency has previously identified a class or category of documents in the normal course of its affairs, it must produce them in response to a request phrased in terms of the class or category. (2) If the agency has never segregated that class or category, production may be required where the agency may be able to identify that material with reasonable effort.

█ Even where an agency has previously identified a class of materials, the passage of time may work such changes in the agency's personnel and records that production requires that identification begin anew. In such circumstances, production may be required only if the task imposed on the agency is not unreasonable.

█ Where rulemaking proceedings have taken place, the agency has, by definition, already identified its sup-

23. 138 U.S.App.D.C. 22, 424 F.2d 935, 938 (1970).

24. *See* Joint Appendix 200–222.

25. *Id.* at 938 n. 7. The Notice of Proposed Rulemaking, 32 Fed.Reg. 9843 (July 6, 1967), stated:
 In taking this action the [Federal Trade] Commission has considered,

among other things, . . . ; and on the basis of its accumulated experience and available studies and reports, is of the opinion that the public interest in a Trade Regulation Rulemaking proceeding is specific and substantial [*sic*].

26. 138 U.S.App.D.C. 22, 424 F.2d 935, 938 n. 8 (1970).

porting documents. Indeed, it would be a most reasonable practice for the agency to retain the documents as a group or index them for future retrieval. It would be most difficult to rebut the presumption that the agency would be able to produce the documents at least until the validity of its rule has been finally adjudicated in the courts.[27]

Finally, *Bristol-Myers* establishes that the specificity with which the agency has identified documents in its public statements is relevant only to the requirement that the request be as specific as reasonably possible. It is not relevant to the question whether the agency can be required to identify and allow inspection of the requested records under section 552(a)(3).[28]

In the present case the Commission has refused either to state that it did not make use of a mass of financial documents or to identify them. In fact, the District Court openly invited the former response from the Commission witnesses, but they repeatedly asserted that there was a documentary basis for the Commission's action, although it had not been identified in the notices of rulemaking.[29]

The NCTA phrased its request as specifically as the Commission's public notices reasonably permitted. Accordingly, the Commission should have been required to identify, at least by relevant classes and subclasses, all the documents that it had used to support its proposed rule. Then it should have been required to establish which of those documents were exempt from disclosure under the applicable provisions of the Act.

Much of this has now been done, albeit by the NCTA through its examination of Commission staff members. But there remains a substantial factual issue as to whether the Commission relied on trade publications and confidential reports, rather than vague concepts of the profitability of its regulated industries, in preparing its fee schedule. On remand, the Commission should be required to specify, by relevant category and subcategory, which—if any—of these materials it used.

For the future we think that these matters should be settled through the discovery process as much as possible. The civil rules governing pretrial discovery provide ample tools for use in compelling the agency to identify and disclose the documents it has that fall within the class or category requested.[30] In addition to facilitating the disposition of these cases by summary judgment, this approach will enable the requesting person to narrow his request if he discovers that he wants only a part of the supporting documents that the agency identifies in response to his discovery requests.[31]

---

27. Rules reviewable under the Administrative Procedure Act *see* 5 U.S.C. § 704 (1970), are to be "held unlawful and set aside" if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," among other things. *Id.* § 706.

 This limited scope of review does not exclude review of the underlying facts and assumptions upon which the agency acted. The agency has a responsibility to maintain its ability to produce this information at least until final adjudication of the rule.

28. The question whether documents must be made available under 5 U.S.C. § 552 (a)(2), or the due process clause, is not in issue here. *See* Sterling Drug Inc. v.

Federal Trade Comm'n, 146 U.S.App.D.C. 237, 450 F.2d 698 (1971).

29. *See* Joint Appendix 200–01.

30. *See, e. g.,* Rules 33, 34, Fed.R.Civil Proc.

31. *See* Note, 15 Tenn.L.Rev. 737 (1972) (Preliminary discovery by oral examination or written interrogatories is available when desired in order to ascertain the existence, description, nature, custody, condition and location of documents or tangible things.")

 This approach was taken in Grumman Aircraft Engineering Corp. v. Renegotiation Board, C.A., 325 F.Supp. 1146 (D.D.C. 1971), on remand from this court's decision, 138 U.S.App.D.C. 147, 425 F.2d 578 (1970).

## B. The Commission's Exemption Claims

Because of the confusion involved in identifying the documents that existed within the scope of the NCTA's request in this case, the District Court was entirely diverted from the necessary inquiry into the exemptions now claimed by the Commission. Indeed, the oral ruling of the District Court denied the NCTA's entire request on the ground that the "yellow work sheets" and adding machine tapes used to prepare the "cost factor" from the budget were exempt. Yet, so far as we can determine, these were the only "documents" that the hearing showed not to exist.

On the record before us, we perceive two possible exemptions that might justify withholding part of the material that the Commission admits it possesses. Under the applicable case law, however, neither would justify nondisclosure on this record, and the Commission must be required to establish the exemptions on the remand.

### 1. Intra-agency Memoranda

The Commission asserted below that inspection of the memoranda used in the preparation of the budget "request" and the memoranda used to determine the "value to the recipient of the privileges granted" could not be ordered. It pointed to section 552(b)(5) of the Act, which exempts "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." [32] The District Court made no further inquiry into the matter, and the Commission produced nothing except a flat assertion that the documents "contained" policy arguments and were "confidential." [33]

■ Both our own cases [34] and the Supreme Court's recent holding in Environmental Protection Agency v. Mink [35] make it clear that this is insufficient. In *Mink* the Supreme Court said:

Congress sensibly discarded a wooden exemption that could have meant disclosure of manifestly private and confidential policy recommendations simply because the document containing them also happened to contain factual data. That decision should not be taken, however, to embrace an equally wooden exemption permitting the withholding of factual material otherwise available on discovery merely because it was placed in a memorandum with matters of law, policy or opinion.[36]

This distinction is particularly important here, where the memoranda at issue relate to the development of a fee schedule said to have been derived from cost data and collections of financial reports. The Commission must show that any factual matter in the memoranda is so "intertwined with policymaking processes" that it would violate the purpose of the exemption to disclose it.[37]

*Mink* went on to point out that the District Court may use a variety of tools in making this determination, including, but not limited to, *in camera* inspection of some or all of the documents.[38] Additionally, we note that the District Court in the Southern District of New York has recently resolved such a Freedom of Information Act case by appointing a Master and delegating the task of *in camera* inspection to him.[39]

32. 5 U.S.C. § 552(b)(5) (1970).

33. *See* text at note 15 *supra*.

34. *See, e. g.,* Ackerly v. Ley, 137 U.S.App. D.C. 133, 420 F.2d 1336 (1969).

35. 410 U.S. 73, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973).

36. *Id.* at 91, 93 S.Ct. at 838.

37. *Id. See* Mink v. Environmental Protection Agency, 150 U.S.App.D.C. 233, 464 F.2d 742, 746 (1972).

38. 410 U.S. at 93, 93 S.Ct. at 839.

39. Frankel v. Securities & Exchange Comm'n, 336 F.Supp. 675 (S.D.N.Y. 1971), reversed on other grounds, 460 F. 2d 813 (2d Cir.), cert. denied, 409 U.S. 889, 93 S.Ct. 125, 34 L.Ed.2d 146 (1972).

## 2. Confidential Financial Statements

█ It is equally unclear whether the "confidential financial statements" that the Commission allegedly used in determining "value to the recipient of the privileges granted" fall within the scope of the Act's exemption for "trade secrets and commercial or financial information obtained from a person and privileged or confidential." [40] The exemption does not protect all data contained in such filings, but only that information which cannot be rendered sufficiently anonymous by deletion of the filing party's name and other identifying information.[41]

In those cases in which the party that filed the statement is so large or unique that disclosure of the data itself would destroy the confidentiality of that party, it is conceivable that total nondisclosure would be justified. But the Commission's witnesses testified that there are many thousands of such statements filed over a long period of time, and it seems highly improbable that the Commission will be able to establish that they must all be withheld.

█ This, too, will be an appropriate subject for the District Court on the remand, armed with the flexible tools cited by *Mink*. In particular, the Court should take note of the Supreme Court's suggestion that representative samples of the statements be examined, rather than the thousands that apparently exist.[42] But, before this examination is undertaken, the Commission should be required to state which, if any, of these documents were used in the preparation of its rules. As we have pointed out, the scope of the NCTA's request was coextensive with the scope of the Commission's documentary basis for its rules.

Reversed and remanded.

40. 5 U.S.C. § 552(b)(4) (1970).

41. *See, e. g.* Fisher v. Renegotiation Board, 153 U.S.App.D.C. 398, 473 F.2d 109 (1972); Grumman Aircraft Engineering Corp. v. Renegotiation Board, 138 U.S. App.D.C. 147, 425 F.2d 578 (1970).

42. 410 U.S. at 93, 93 S.Ct. at 839.