NATIONAL ASSOCIATION OF HOME
BUILDERS OF THE UNITED
STATES, et al., Plaintiffs,

v.

Bruce BABBIT, Secretary, United States
Department of Interior and Mollie Beat-
tie, Director, United States Fish and
Wildlife Service, Defendants.

Civil Action No. 95–1973 RMU.

United States District Court,
District of Columbia.

Dec. 6, 1996.

Patrick J. Hurd, Keller & Heckman,
Washington, DC, Glen Franklin Koontz,
Washington, DC, for Plaintiffs.

John LaDue Marshall, Department of Jus-
tice, Environmental Division, Washington,
DC, for Defendants.

### MEMORANDUM OPINION AND ORDER

Granting Defendants' Motion For
Summary Judgment

URBINA, District Judge.

## I. INTRODUCTION

This matter comes before the court upon
the parties' cross-motions for summary judg-
ment. On April 9, 1996, pursuant to Fed.
R.Civ.P. 65(a)(2), the court consolidated
Plaintiff, County of San Bernardino, Califor-
nia's Motion for a Preliminary Injunction

with the trial on the merits. Plaintiffs are organizations representing land development interests and local governments in California. They have brought this action to challenge the constitutionality of one of the provisions of the Endangered Species Act, 16 U.S.C. § 1531, *et seq.*, specifically, the "take" provision of the Act, 16 U.S.C. § 1538(a)(1)(B). As applied to this case, this provision prohibits the Plaintiffs from developing, without a permit, the last remaining habitat of the Delhi Sands Flower-loving Fly (the Fly), the species at issue in this case.

The court must address purely legal questions regarding the Endangered Species Act and its application to the Fly. Plaintiffs argue that the federal government has "limited and enumerated" powers, and that the authority to regulate wildlife and regulate the use of non-federal land is not among these powers.[1] Plaintiffs maintain that both of these areas of regulation have been reserved to the States by the Tenth Amendment of the U.S. Constitution. Specifically, Plaintiffs assert that the "take" provision of the Endangered Species Act, 16 U.S.C. § 1538(a)(1)(B), is unconstitutional.[2] In support of this argument, Plaintiffs posit that the Commerce Clause of the Constitution does not provide Congress with the authority to regulate "purely local activities that affect a species found only in California."[3] As a result, Plaintiffs ask this court to enjoin Defendants from enforcing the "take" provision of the Endangered Species Act as it applies to the Fly.[4] This court, after considering the parties' submissions and the relevant law, concludes that: (1) the federal government's "limited and enumerated" powers do include the power to regulate wildlife and non-federal lands which serve as the habitat for endangered wildlife; and (2) the Endangered Species Act provides for a regulatory scheme that is within the bounds of Congress' power to enact under the Commerce Clause. The court therefore grants Defendants' Motion for Summary Judgment.

## II. BACKGROUND

This matter concerns a species of fly and the Endangered Species Act. The Delhi Sands Flower-loving Fly is indigenous to southwestern San Bernardino County and northwestern Riverside County, California. The parties agree that the all known colonies of the Fly exist solely within an 8 to 10 mile radius of each other in an area straddling both of these counties. The sand contained in this area in California is known as Delhi sand and is the only known habitat for the Fly. Delhi sand covers approximately forty square miles, in irregular patches, in the area between northwestern Riverside and southwestern San Bernardino Counties.

In the recent past, the Fly's habitat was used primarily for agricultural purposes. Over approximately the past ten years, however, residential and commercial development has severely depleted the Fly's habitat. The Fish and Wildlife Service (FWS) estimates that only approximately 1200 acres of suitable habitat remains for the Fly. There are also several thousand acres of potentially restorable acreage.

Plaintiff County of San Bernardino has pursued the construction of a hospital which is located on and adjacent to one of the last remaining habitats of the Fly. The hospital site was selected in 1987. After the selection process, the site was discovered to be the home to a colony of the Fly. The day before construction was to begin, September 23, 1993, the FWS designated the Fly to be an endangered species. *See* 58 Fed.Reg. 49881 (1993). The FWS found that the Fly was in "imminent danger of extinction due to extensive habitat loss and degradation that has reduced its range by 97 percent." *Id.* at 49881. The listing of the Fly as an endangered species automatically activated the protections included in the Act. Included in these protections is a prohibition against the "taking" of an endangered species. 16 U.S.C. § 1538(a)(1)(B). The definition of "taking" includes the destruction or adverse

1. Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Summary Judgment at 14.

2. *Id.* at 26.

3. *Id.*

4. *Id.* at 2.

modification of an endangered species' habitat. *See* 50 C.F.R. § 17.3 (1991). Violation of the "take" provision can subject the violator to severe penalties. 16 U.S.C. § 1540. The listing of the Fly as an endangered species caused a delay in the start of construction on the hospital and eventually forced the county to build the hospital some 250 feet north of the original site to ensure that there was no "taking" of the Fly.

As part of this construction project, the county is also redesigning an intersection located near the hospital. The redesign of this intersection calls for the realignment of one of the roads which constitute the intersection. The parties agree that the realignment plan chosen by the county will cause the new roadway to encroach on a "migration corridor" set up by the FWS for the Fly. The purpose of the corridor is to enable the Fly to travel from one protected area to another nearby area where a colony of the Fly is located. The FWS steadfastly maintains that the alignment plan chosen by the county will amount to a taking of the Fly's habitat and is therefore in violation of the "take" provision of the Act.

Plaintiffs have provided ample evidence that the listing of the Fly as an endangered species has caused them to incur a substantial economic burden. These costs include the added expense of re-drafting the plans for the construction of the hospital, setting aside habitat for the Fly and examining different alternatives to minimize the impact of the redesign of the intersection on the Fly. In addition, the listing of the Fly has affected several local governments' ability to attract new employers to the region and to expand the physical plants of at least two current industrial employers in the area. Plaintiffs, however, do not ask this court to nullify the Act or its application to the Fly based on this sustained economic burden. Plaintiffs state that they are *not* asking the court "to make any sort of value judgment" which would require a balancing of the economic burdens imposed on individuals or municipalities by

the Act versus the potential value to the nation of a single species.[5] Rather, Plaintiffs argue that Congress has *no* authority to regulate the "taking" of the Fly, irrespective of whether such regulation imposes an economic burden.[6]

## III. ANALYSIS

### A. Legal Standard

Summary judgment is appropriate when the "pleadings, depositions [ ] show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also National Cable Television Assoc., Inc. v. FCC*, 479 F.2d 183, 186 (D.C.Cir.1973). When more than one party moves for summary judgment, each party must carry its own burden of proof. *United States Dep't. of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 755, 109 S.Ct. 1468, 1472–73, 103 L.Ed.2d 774 (1989). On cross-motions for summary judgment, the court shall not grant summary judgment unless one of the parties is entitled to judgment as a matter of law. *Rhoads v. McFerran*, 517 F.2d 66, 67 (2d Cir.1975); *see also* 6 James W. Moore, *et al.*, Moore's Federal Practice ¶ 56.13, at 56–171 (2d ed. 1994). When the unresolved issues are preliminarily legal, however, summary judgment is particularly appropriate. *Crain v. Police Comm'rs of Metro. Police Dep't.*, 920 F.2d 1402, 1405–06 (8th Cir.1990).

### B. Congress' Power to Regulate Wildlife

#### 1. The Commerce Clause

Article 1, Section 8 of the United States Constitution provides Congress with the power to "regulate commerce with foreign nations, and among the several states, and with the Indian tribes." The Supreme Court has held that the Commerce Clause provides Congress with broad regulatory authority. *See Hughes v. Oklahoma*, 441 U.S. 322, 326 n. 2, 99 S.Ct. 1727, 1731 n. 2, 60 L.Ed.2d 250 (1979) (stating that, " '[t]he Commerce

---

**5.** *See* Plaintiffs' Opposition to Defendants' Cross–Motion For Summary Judgment at 4 (emphasis added). Plaintiffs likewise have not asked the court to examine whether the FWS's establish-

ment of the "migration corridor" was necessary or appropriate.

**6.** *Id.* at 3 (emphasis added).

Clause is one of the most prolific sources of national power[.]' ") (*quoting H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 534, 69 S.Ct. 657, 663, 93 L.Ed. 865 (1949)). Moreover, "[a] court's review of congressional enactments under the Commerce Clause should be highly deferential." *Leslie Salt Co. v. United States*, 55 F.3d 1388, 1395 (9th Cir. 1995) (*citing United States v. Evans*, 928 F.2d 858, 862 (9th Cir.1991)). "The power to regulate commerce is plenary and once the power exists it is for Congress, not the courts, to choose the ends for which its exercise is appropriate." *United States v. Helsley*, 615 F.2d 784, 787 (9th Cir.1979).

In addition, regulation of intrastate activity is a proper exercise of the authority granted to Congress pursuant to the Commerce Clause if there is a rational basis to conclude that the federal regulation of said activity was essential to the control of interstate commerce. *See Maryland v. Wirtz*, 392 U.S. 183, 198, 88 S.Ct. 2017, 2025, 20 L.Ed.2d 1020 (1968) (test is "whether there is a rational basis for regarding [the statute] as regulations of commerce among the States."); *see also United States v. Rambo*, 74 F.3d 948, 952 (9th Cir.1996).[7] "A court may invalidate legislation enacted under the Commerce Clause only if it is clear that there is no rational basis for a congressional finding that the regulated activity affects interstate commerce, or that there is no reasonable connection between the regulatory means selected and the asserted ends." *Hodel v. Indiana*, 452 U.S. at 323–24, 101 S.Ct. at 2383. "The pertinent inquiry is [ ] whether Congress could rationally conclude that the regulated activity affects interstate commerce." *Id.* at 324, 101 S.Ct. at 2383. Importantly, each provision of a statute does not have to be

independently related to interstate commerce. *Id.* at 329 n. 17, 101 S.Ct. at 2386 n. 17. A court must evaluate the particular statute as a whole. *Id.*

Whether an activity is "local" or "intrastate" is not dispositive with respect to the issue of whether Congress may regulate it under the commerce clause. *Hodel v. Virginia Surface Min. and Reclamation Ass'n, Inc.*, 452 U.S. 264, 281, 101 S.Ct. 2352, 2362–63, 69 L.Ed.2d 1 (1981). The Commerce Clause power extends to local activity which affects interstate commerce, or the exertion of the power of Congress over it, as to make regulation of the local activity "an appropriate means to the attainment of a legitimate end, the effective execution of the granted power to regulate interstate commerce." *Id.*; *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 471, 101 S.Ct. 715, 727–28, 66 L.Ed.2d 659 (1981) (Commerce Clause limits the power of individual states to interfere with interstate commerce even if the state's actions are aimed at addressing a legitimate local concern); *see also Wickard v. Filburn*, 317 U.S. 111, 124–25, 63 S.Ct. 82, 88–89, 87 L.Ed. 122 (1942). Furthermore, a state's right to control wildlife within its border must yield to the federal government proper exercise of federal power. *Baldwin v. Fish and Game Commission of Montana*, 436 U.S. 371, 385–86, 98 S.Ct. 1852, 1861–62, 56 L.Ed.2d 354 (1978).

The Supreme Court has recently re-examined Congress' power under the Commerce Clause and identified three broad categories of activities that may be regulated by Congress under its interstate commerce authority. *See United States v. Lopez*, —— U.S. ——, ——, 115 S.Ct. 1624, 1629, 131 L.Ed.2d 626 (1995).[8] First, Congress may regulate

---

**7.** The Supreme Court has held that this authority includes Congress' power to regulate surface coal mining on prime farm land, *Hodel v. Indiana*, 452 U.S. 314, 101 S.Ct. 2376, 69 L.Ed.2d 40 (1981); the growing of wheat for home consumption, *Wickard v. Filburn*, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942); and the taking of fish from state waters, *Douglas v. Seacoast Products, Inc.*, 431 U.S. 265, 97 S.Ct. 1740, 52 L.Ed.2d 304 (1977).

**8.** The Court in *Lopez* struck down the Gun–Free School Zones Act, 18 U.S.C. Section 922(q), because "possession of a firearm in a local school

zone does [not] substantially affect interstate commerce." —— U.S. at ——, 115 S.Ct. at 1632. The *Lopez* Court stated that in reaching its decision, the Court was declining to further expand the reach of the Commerce Clause. *Id.* at ——, 115 S.Ct. at 1634. The Court, however, left intact its pre-*Lopez* decisions concerning Congress' power under the Commerce Clause. Justice Kennedy, whom Justice O'Conner joined, stated that:

[t]he legal system as a whole ha[s] an immense stake in the stability of our Commerce Clause jurisprudence as it has evolved to this point.

the use of the channels of interstate commerce. *Id.* at ——, 115 S.Ct. at 1629. Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. *Id.* Third, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce. *Id.* at —— – ——, 115 S.Ct. at 1629–30. The *Lopez* Court, however, was clear in stating that "[w]here economic activity substantially affects interstate commerce, legislation regulating that activity" should be judicially sustained, even though the activity may be purely local. *Id.* at ——, 115 S.Ct. at 1630. In this case, Congress has validly exercised its power to regulate "things," specifically wildlife, that affect interstate commerce. The government has also established that the local activity that the "take" provision of the Act seeks to prohibit has a substantial relation to interstate commerce.[9]

### 2. Federal Regulation of Wildlife

A review of the framework of the Endangered Species Act, the legislative record supporting its enactment, and the case law construing Congress' power to regulate wildlife, establishes, in this court's view, that Congress has the constitutional power to protect wildlife, including the Fly at issue in this case. The Endangered Species Act was enacted to address Congress' concern over the rapid depletion of our Nation's, as well as the world's, natural wildlife. Congress found that "these species [ ] are of esthetic, ecological, educational, historical, recreational and

scientific value to the Nation and its people." 16 U.S.C. § 1531(a)(3). The Act builds upon the work of previous legislation directed at this objective.[10] The passage of the Act in 1973 was the result of Congress being persuaded that "a more expansive approach was needed if the newly declared national policy of preserving endangered species was to be realized." *TVA v. Hill,* 437 U.S. 153, 176, 98 S.Ct. 2279, 2293, 57 L.Ed.2d 117 (1978). At the congressional hearings held prior to the passage of the Act, Congress was informed that species were being lost at a rate of one per year, despite the earlier passage of two bills aimed at curbing the destruction and extinction of endangered species. *Id.* In addition, the "pace of the disappearance of species" was accelerating. H.R.Rep. No. 93–412, p. 4 (1973).

Officials of the Department of the Interior testified that this accelerated pace of species disappearance was due to man's continued destruction and exploitation of natural habitats:

> [M]an and his technology has [sic] continued at any [sic] ever-increasing rate to disrupt the natural ecosystem. This has resulted in a dramatic rise in the number and severity of the threats faced by the world's wildlife. The truth in this is apparent when one realizes that half of the recorded extinctions of mammals over the past 2000 years have occurred in the most recent 50 year period.[11]

The Report of the House Committee on Merchant Marine and Fisheries on H.R. 37 explained the value of the genetic code of all creatures to this Nation, as well as mankind,

---

**9.** Having thus concluded, the court does not reach Defendants' argument that the "take" provision falls under the "channels of commerce" category enunciated by the Court in *Lopez.*

**10.** In 1966, Congress passed the first Endangered Species Act, 80 Stat. 926, repealed, 87 Stat. 903. This legislation declared the preservation of endangered species to be a national policy and gave the Secretary of the Interior the power to identify the "names of the species of native fish and wildlife found to be threatened with extinction." § 1(c), 80 Stat. 926. In addition, the 1966 Act gave the Secretary the power to purchase land for the conservation, protection and restoration of selected species of native fish and wildlife. §§ 2(a)–(c), 80 Stat. 926–27. The

1966 Act, however, was applicable only to endangered species located on federal land. § 4(c), 80 Stat. 928.

In 1969, Congress enacted the Endangered Species Conservation Act which broadened the federal government's involvement in the preservation of endangered species. 83 Stat. 275, repealed, 87 Stat. 903. This legislation prohibited the importation into the United States of any species designated "endangered" by the Secretary. § 2, 83 Stat. 275.

**11.** Hearings on Endangered Species before a Subcommittee of the House Committee on Merchant Marine and Fisheries, 93d Cong., 1st Sess., 202 (1973) (statement of Assistant Secretary of the Interior).

when it stated that "[t]he value of this genetic heritage is, quite literally, incalculable." H.R.Rep. No. 93–412, pp. 4–5 (1973).[12] In addition, the Supreme Court in *TVA v. Hill*, noted that "the legislative proceedings in 1973 are, in fact, replete with expressions of concern over the risk that might lie in the loss of any endangered species." 437 U.S. at 177, 98 S.Ct. at 2293 (footnote omitted). "Congress was concerned about the unknown uses that endangered species might have and about the unforeseeable places such creatures may have in the chain of life." *Id.* at 178–79, 98 S.Ct. at 2294. Congress also established that the greatest threat to endangered species was destruction of natural habitat. *Id.* at 179, 98 S.Ct. at 2294 (citations omitted).

It was Congress' belief that the "[p]rotection of endangered species is not a matter that can be handled in the absence of coherent national and international policies: the results of a series of unconnected and disorganized policies and programs by various states might well be confusion compounded." H.R. 37, 93d Cong., 1st Sess., at 146 (1973). Consequently, Congress enacted the Endangered Species Act. The Act is Congress' vehicle for addressing the rapid loss of the world's species. The Act provides for a comprehensive framework for the protection of endangered and threatened species.[13] It regulates endangered wildlife by first listing a particular species as threatened or endangered. It then proscribes a regime for its protection and conservation. The Secretary of Interior is responsible for determining whether to list a species. *See* 16 U.S.C. § 1533(a). The Secretary considers, *inter alia*, the "present or threatened destruction, modification, or curtailment of [a species'] habitat or range" and the "over utilization for commercial, recreational, scientific or educational purposes." 16 U.S.C. § 1533(a)(1)(A) and (B).

A listed species is endowed with a set of protections. Specifically, Section 9(a)(1) of the Act makes it unlawful for both federal and nonfederal actors to:

(A) import any such species into, or export any such species from the United States;

(B) take any such species within the United States or the territorial seas of the United States;

(C) take any such species on the high seas;

(D) possess, sell, deliver, carry, transport, or ship, by any means whatsoever, any such species taken in violation of subparagraphs (B) and (C);

(E) deliver, receive, carry, transport, or ship in interstate commerce, by any means whatsoever and in the course of a commercial activity, any such species;

(F) sell or offer for sale in interstate or foreign commerce any such species[,]

16 U.S.C. § 1538(a)(1).

To "take" means "to harass, harm, pursue, hunt, shoot wound, kill, trap, capture, or collect, or to attempt to engage in any such activity." 16 U.S.C. § 1532(19). According to the FWS, "harm" means:

an act which actually kills or injures wildlife. Such an act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patters, including breeding, feeding, or sheltering.

50 C.F.R. 17.3; *see also Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, —— U.S. ——, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995).

These prohibitions are not, however, absolute. Under Section 10(a)(1) of the Act, the Secretary is authorized to permit any nonfederal party to undertake,

---

**12.** H.R. 37 was the House version of the Endangered Species Act. H.R. 37 contained all of the substantive provisions which were eventually included in the final version of the Act passed by both houses of Congress.

**13.** "Endangered species" means any species "which is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). "Threatened species" means "any species which is likely to become an endangered species within a foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(2). Listed species are those that are classified as threatened or endangered.

(A) any act otherwise prohibited by section [9] of this title for scientific purposes or to enhance the propagation or survival of the affected species[.];

(B) any taking otherwise prohibited by section [9] if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity.

16 U.S.C. § 1539(a)(1). Federal agencies are also provided with an exemption for a "take" that is incidental to otherwise lawful actions. *See* 16 U.S.C. § 1536(b)(4) and (*o*).

The Act contains, in Section 11, an enforcement mechanism, which contains penalty provisions. Under § 1540(e)(6), the Department of Justice may seek injunctive relief to enjoin violation of the Act. It can also seek criminal sanctions for knowing violations of the Act. *See* 16 U.S.C. § 1540(b). The Secretary may seek civil penalties for knowing violations of the Act. *See* 16 U.S.C. § 1540(a). Finally, the public may sue "any person" to enforce the provisions of the Act. *See* 16 U.S.C. § 1540(g).

Plaintiffs do not dispute the fact that this congressionally sanctioned regime, established for the protection of threatened and endangered species, is of considerable importance.[14] Instead, Plaintiffs claim that Congress has no power to further the admittedly laudable goal of saving threatened and endangered species from extinction.[15] More specifically, Plaintiffs argue that the application of the Act to "purely local activities that affect a species found only in California," i.e. the Fly, is unconstitutional.[16] Plaintiffs maintain that the federal government's prohibition on the "taking" of the Fly, as proscribed by 16 U.S.C. 1538(a)(1)(B), is not supported by Congress' power under the Commerce Clause and is therefore *ultra vires*. The court, however, disagrees. The application of 16 U.S.C. § 1538(a)(1)(B) to the Fly is a valid exercise of Congress' power under the Commerce Clause.

### a. Articles of Commerce

■ The record before the court clearly shows that wildlife in general, and the Fly in particular, are "thing[s] in interstate commerce." *See United States v. Lopez,* —— U.S. ——, ——, 115 S.Ct. 1624, 1629, 131 L.Ed.2d 626 (1995). Congress recognized this fact, observing that:

> The threat to animals may arise from a variety of sources; principally pollution, destruction of habitat and the pressures of trade. For the most part, United States executive and legislative attention in recent years has concentrated upon the latter factor in attempting to enforce legislation designed to reduce or eliminate the financial incentives to trading in endangered species of fish and wildlife.

> Honesty compels us to admit that steps taken by H.R. 37 to close the U.S. market to trade in endangered and threatened species my not be sufficient, in and of themselves, to remove pressure and thus to allow these species to recover. Passage of this legislation is, however, of importance—both because the United States is an important market, and because of the precedent that it will create.

H.R.Rep. No. 93–412, 93rd Cong., 1st Sess., at 141, 145.

Moreover, the government has established that wildlife, including insects, is part of the stream of interstate commerce. The U.S. accounts for approximately $1.2 billion per annum in declared value of imported and exported wildlife. *See* TRAFFIC USA, U.S. Annual Imports of Wildlife. Surprisingly, "[t]he global trade in illegal wildlife generates more profits than illegal arms sales, and constitutes a world black market second only in size to the drug trade." R. Anderson, "The Lacey Act: America's Premier Weapon in the Fight Against Unlawful Wildlife Trafficking," 16 Public Land L.Rev. 26, 31 (1995) (footnotes omitted).

Relating specifically to the Fly, the government has offered uncontroverted evidence

---

14. *See* Plaintiffs' Opposition to Defendants' Motion for Summary Judgment at 4.

15. *Id.* at 4–5.

16. Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Summary Judgment at 26.

that the Fly is, and would likely continue to be, an article in interstate commerce.[17] The Fly is currently on exhibit in at least three museums located outside of the state of California. In addition, the Fly has been the subject of interstate trade among insect collectors. Lastly, interested persons have traveled from outside the state of California to observe and study the Fly.

### b. Relation to Interstate Commerce

The prohibition on the "taking" of threatened or endangered species has a substantial relation to interstate commerce.[18] The aggregate impact upon interstate commerce of trade in wildlife is substantial and as such, it may be regulated by Congress.[19] Moreover, "[e]ven activity that is purely intrastate in character may be regulated by Congress, where the activity, combined with like conduct by others similarly situated, affects commerce among the States[.]" *Fry v. United States*, 421 U.S. 542, 547, 95 S.Ct. 1792, 1795, 44 L.Ed.2d 363 (1975). The "taking" of individual species located entirely within one state, would clearly, in the aggregate, have a significant effect upon interstate commerce.[20] Furthermore, the activity that Congress is regulating need not itself be commercial. "[E]ven if [the] activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce, and this irrespective of whether such effect is [ ] defined as 'direct' or 'indirect.'" *Wickard v. Filburn*, 317 U.S. 111, 125, 63 S.Ct. 82, 89, 87 L.Ed. 122 (1942).

In *Palila v. Hawaii Dep't. of Land and Natural Resources*, 471 F.Supp. 985 (D. Ha-

waii 1979), *aff'd*, 639 F.2d 495 (9th Cir.1981), the court addressed the issue of whether the "take" provision of the Endangered Species Act can be applied to a species indigenous to a single state. *Palila* involved the taking of a species, a small bird, found only on the island of Hawaii within the state of Hawaii. *Id.* at 988. The natural habitat of the palila was being destroyed by the grazing patterns of feral sheep and goats located within the same geographic area. *Id.* at 989–90. The feral sheep and goat population was maintained by the Hawaii Department of Land and Natural Resources for the purpose of sport hunting. *Id.* at 989. The court concluded that even a species located entirely within the confines of single state can have an effect on interstate commerce and therefore the application of the Act to such a species was a valid exercise of Congress' power under the Commerce Clause. *Id.* at 995. The court noted that a "national program to protect and improve habitats of endangered species preserves the possibilities of interstate commerce in these species and of the interstate movement of persons, such as amateur students of nature or professional scientists who come to a state to observe and study these species" and, therefore, certainly falls within the power of Congress to regulate commerce. *Palila v. Hawaii Dep't. of Land and Natural Resources*, 471 F.Supp. 985, 995 (D.Hawaii 1979), *aff'd*, 639 F.2d 495 (9th Cir.1981); *see also Douglas v. Seacoast Products, Inc.*, 431 U.S. 265, 97 S.Ct. 1740, 52 L.Ed.2d 304 (1977) (Congress has the power to regulate the taking of fish from state waters pursuant to the Commerce Clause); *United States v. Kepler*, 531 F.2d 796 (6th

---

**17.** Of course, interstate commercial trading in the Fly halted once it was declared "endangered" by the Secretary. Plaintiffs seem to be arguing that since the Act halted interstate commercial activity involving the Fly, the Fly can no longer be protected by the Act because it has lost its nexus to interstate commerce. If the court were to accept this argument, it would turn the Act on its head. Plaintiffs' logic would not afford any protection to a truly rare species, i.e. one that, due to its scarcity, cannot be transported in large numbers in interstate commerce.

**18.** Congress was well aware of this fact as the legislative history discussion reflects. *See* Section III, B, 2, *supra*.

**19.** Congress is not required, as Plaintiffs intimate, "to make formal findings as to the substantial burdens that an activity has on interstate commerce." *Lopez*, —— U.S. at ——, 115 S.Ct. at 1631.

**20.** "Where the class of activities is regulated and that class is within the reach of the federal power, the courts have no power 'to excise as trivial individual instances' of the class." *Perez v. United States*, 402 U.S. 146, 154, 91 S.Ct. 1357, 1361, 28 L.Ed.2d 686 (1971) (quoting *Maryland v. Wirtz*, 392 U.S. 183, 193, 88 S.Ct. 2017, 2022, 20 L.Ed.2d 1020 (1968)).

Cir.1976) (Endangered Species Act "permissibly regulates" wildlife involved in interstate commerce); *Hodel v. Virginia Surface Mining and Reclamation Association, Inc.,* 452 U.S. 264, 281, 101 S.Ct. 2352, 2362–63, 69 L.Ed.2d 1 (1981) (destruction of fish and wildlife and their habitat affects interstate commerce).

■ The Fly is in an identical situation to the palila. The Fly is located exclusively within the confines of the state of California. Just like the palila, the Fly's natural habitat is now subject to destruction. Plaintiffs do not dispute that such destruction will lead to the extinction of the Fly.[21] The Fly's relationship to interstate commerce is, however, stronger than that of the palila because it has been an article of commerce.[22]

■ Finally, the *Lopez* Court's re-examination of the contours of Congress' power to legislate pursuant to the Commerce Clause does not affect this court's evaluation of the issues in this case. The *Lopez* Court specifically stated that the criminal statute at issue in that case was not "an essential part of a larger regulation of economic activity, in which the regulatory scheme would be undercut unless the intrastate activity were regulated." — U.S. at ——, 115 S.Ct. at 1631. Presently, the "take provision," is an "essential part of a larger" regulatory scheme. *Id.* It allows the federal government to regulate intrastate activities that, in the aggregate, have an interstate impact and which affect endangered species indigenous to small localized areas completely within one state's borders.

This court therefore concludes that the application of 16 U.S.C. § 1538(a)(1)(B) to the Fly is a valid exercise of Congress' power pursuant to the Commerce Clause.

**ORDERED** that Defendants' Motion For Summary Judgment be and is hereby **granted;** and it is

**FURTHER ORDERED** that this case be dismissed from the court's docket with prejudice.

**SO ORDERED.**

---

21. Plaintiffs argue that the FWS's Draft Recovery Plan for the Fly states that the Fly will become extinct irrespective of what measures are taken to conserve its habitat. A careful reading of the Plan, however, demonstrates that the FWS deemed the extinction of the Fly in the foreseeable future a "likely event" *unless* there was an

immediate plan for the management of its habitat put in place. Draft Recovery Plan at 1 (emphasis added).

22. The *Palila* court did not so conclude.