**PALILA (*Psittirostra bailleui*), an endangered species, Sierra Club, a Non-Profit Corporation, National Audubon Society, a Non-Profit Association, Hawaii Audubon Society, a Non-Profit Association, and Alan C. Ziegler, Plaintiffs,**

v.

**HAWAII DEPARTMENT OF LAND AND NATURAL RESOURCES, and Susumu Ono, in his capacity as Chairman of the Hawaii Board of Land and Natural Resources, Defendants.**

Civ. No. 78–0030.

United States District Court, D. Hawaii.

June 6, 1979.

---

Michael R. Sherwood, William S. Curtiss, Sierra Club Legal Defense Fund, Inc., San Francisco, Cal., William S. Hunt, Hart, Leavitt & Hunt, Honolulu, Hawaii, for plaintiffs.

Wayne Minami, Atty. Gen., State of Hawaii, by Lester G. L. Wong, Deputy Atty. Gen., Honolulu, Hawaii, for defendants.

## DECISION

SAMUEL P. KING, District Judge.

### STATEMENT OF THE CASE

The Palila (*Psittirostra baileui*) seeks the protection of this Court from harm caused by feral sheep and goats.

An action for declaratory and injunctive relief was filed in the name of the Palila by the Sierra Club, National Audubon Society, Hawaii Audubon Society, and Alan C. Ziegler, suing as next friends and on their own behalf, as plaintiffs. The Department of Land and Natural Resources of the State of Hawaii and the Chairman of the Board of Land and Natural Resources,[1] who is the executive officer of the Department, are named as defendants. The action is brought pursuant to the Endangered Species Act of 1973 (Act), 16 U.S.C. § 1531, *et seq.* (1974). The matter is before me on plaintiffs' motion for summary judgment.

Plaintiffs contend that defendants are "taking" the Palila in violation of Section 9 of the Act, 16 U.S.C. § 1538(a)(1)(B), by maintaining destructive populations of feral sheep and goats in the Palila's critical habitat on the slopes of Mauna Kea on the Island of Hawaii. Defendants deny that the undisputed facts support the alleged violation.

---

1. The action was originally filed against William Y. Thompson, in his capacity as Chairman of the Board. Since that time, the chairmanship has been assumed by Susumu Ono. Pursuant to Rule 25(d), Fed.R.Civ.Proc., Chairman Ono is automatically substituted as a defendant for former Chairman Thompson.

## FACTUAL BACKGROUND

The six-inch long Palila is a finch-billed member of the Hawaiian Honeycreeper family (*Drepanididae*). It is found only in Hawaii. The Palila's present population numbers between 1,400 and 1,600 birds. The range of the entire known population coincides with and is limited to the remaining mamane (*Sophora chrysophylla*) and naio (*Myoporum sandwicense*) forests on the slopes of Mauna Kea on the Island of Hawaii between the elevations of 6,400 feet and 9,500 feet—about 10 percent of the bird's historical range.

The Palila has been listed by the Secretary of the Interior as an endangered species since 1967, when it was first so identified pursuant to the predecessor of the present Act. 32 Fed.Reg. 4001 (1967). Out of a total of 36 bird species listed at the time, 20 species, including the Palila, were endemic Hawaiian birds. *Id.* The Palila remains on the latest endangered species list. 50 C.F.R. § 17.11 (1978). Experts agree that the Palila population is dangerously close to that minimum number of individuals below which a population cannot drop if the species is to survive.[2] In fact, in 1975, the U.S. Fish and Wildlife Service named the Palila as one of the 10 "high priority species" whose "critical habitat"[3] should be determined "as rapidly as possible" pursuant to 16 U.S.C. § 1536. 40 Fed. Reg. 21499, 21501 (1975). The U.S. Fish and Wildlife Service officially designated the Palila's critical habitat in 1977, 50 C.F.R. § 17.95, following the unanimous recommendation of the Service-appointed Palila Recovery Team.[4]

The Palila's critical habitat encompasses the remaining 10 percent of the Palila's

---

**2.** Members of the Palila Recovery Team, see note 4, *infra,* who have studied the Palila in depth, believe that the Palila population is approaching a "dangerously low level." Deposition of Dr. Andrew Berger, Palila Recovery Team Leader, 42.

Defendants argue that the Palila population has, in fact, increased and that the Palila is not at its "minimal population level." The "minimal population level" of a species is the level below which the species cannot fall without being doomed to eventual extinction. That level is not necessarily the last few remaining individuals, but is a point at which the species lacks sufficient genetic variability to protect itself from disease or lacks the requisite number of individuals to initiate breeding for the group.

There is no dispute that the Palila's minimal population level is unknown; but the only way to determine that level is to allow the Palila population to reach the level at which the species could not survive.

In arguing that the Palila population has increased, defendants compare the initial population estimate by the U.S. Fish and Wildlife Service for the Palila of "low hundreds" to the present estimate of 1,400 to 1,600. The Service published the lower estimate in its 1973 list of threatened wildlife before any census of the Palila had been conducted. The first systematic census of the bird occurred in January 1975, and a second census followed in September 1975. Both censuses were conducted by representatives of state and federal agencies, including representatives of DLNR, and are the bases for the present population estimate.

The present estimate may be deceptively high because the Palila Recovery Team reports an apparent overabundance of males, which indicates that the breeding population of the Palila, and thus, the genetic pool, are much smaller than 1,400 to 1,600 birds.

**3.** The Act does not define "critical habitat" but the Secretary of the Interior has construed the term by regulation:

"Critical habitat" means any air, land, or water area (exclusive of those existing man-made structures or settlements which are not necessary to the survival and recovery of a listed species) and constituent elements thereof, the loss of which would appreciably decrease the likelihood of the survival and recovery of a listed species or a distinct segment of its population. The constituent elements of critical habit include, but are not limited to: physical structures and topography, biota, climate, human activity, and the quality and chemical content of land, water, and air. Critical habitat may represent any portion of the present habitat of a listed species and may include additional areas for reasonable population expansion.

50 C.F.R. § 402.02 (1978).

**4.** The Palila Recovery Team was appointed pursuant to the Act to devise a plan of action to restore the Palila to nonendangered status. The team members included two wildlife biologists employed by defendant DLNR and a Professor of Zoology at the University of Hawaii who wrote the authoritative book on Hawaiian birds.

The Team's work product, the Palila Recovery Plan, was officially approved by the Director of the U.S. Fish and Wildlife Service on January 23, 1978.

historical range.[5] This includes the existing mamane-naio forest on Mauna Kea. About 20 to 30 percent of the critical habitat presently contains no Palila. However, the Palila requires the entire designated habitat, not only to allow for population expansion, but also to allow for movement of the Palila flocks as part of their normal life cycle.[6]

The mamane-naio forest is essential for the Palila's survival.[7] The bird has evolved in the mamane-naio ecosystem over the centuries and is uniquely adapted to feeding upon the mamane. The mamane trees provide food, shelter and nest sites for the Palila. The naio trees are of secondary importance as nest sites.

5. Recovery Team members later testified in deposition that the ideal critical habitat would have encompassed the Palila's entire historical range. However, the Team's recommendation was influenced by a practical consideration of the interests of defendants and game hunters.

6. Defendants contend that the Palila's situation is not critical because its population can expand within its present habitat and there is thus sufficient forest to sustain it. By implying that there are fewer numbers of Palila within its critical habitat than that habitat could support, defendants' argument only serves to emphasize the plight of the bird. The Palila Recovery Plan states that one of the primary reasons for first classifying the Palila as endangered was that "it no longer occupied a significant portion of its historical range." PALILA RECOVERY TEAM, PALILA RECOVERY PLAN 1 (1977).

7. Defendants argue that no one can state for certain that the Palila cannot survive without mamane because no attempts have ever been made to raise the Palila in captivity in an environment without mamane.

 However, all the evidence presented points to the fact that the Palila cannot survive without the forest. 42 Fed.Reg. 40687 (1977); PALILA RECOVERY PLAN 32. Expert witnesses deposed by plaintiffs explained that the Palila, like other Hawaiian forest birds, is unable to adapt to drastic changes in its environment because it has become intimately tied to the mamane-naio forest through evolution. Such specialization is characteristic of plants and animals which inhabit isolated island environments.

 Team members also testified that the Team considered and rejected the possibility of captive breeding because there would be no point in expending large amounts of money to raise

Since 1950, defendants have maintained populations of feral [8] sheep (*Ovis aries*) and feral goats (*Capra hircus*) within a State Game Management Area established on the slopes of Mauna Kea by the Department for sport-hunting purposes. Unfortunately for the Palila, the State's Mauna Kea Game Management Area includes most of the Palila's critical habitat.

The feral goat population in the critical habitat currently numbers between 200 to 300 and the feral sheep population numbers about 600. The sheep population has fluctuated greatly, from an estimated 40,000 sheep in 1936, to an estimated 550 sheep as of December 1978, as a result of the interplay between hunter pressure and defendants' game management policies.[9]

the birds only to release them into a vanishing habitat.

8. A "feral" animal is one that was once domesticated or is descended from domesticated animals but is now living as a wild creature.

 The feral sheep and goats were first introduced as domestic animals to the Island of Hawaii in the late 18th century by Captain Vancouver.

9. The low population of feral sheep as of December 1978, was due to a recently ended hunting season.

 Local government realized as early as 1921 that feral sheep were destroying the mamane forest. Between 1921 and 1946, over 45,000 feral sheep were killed pursuant to programs initiated by the Territorial Government, so that by 1949, only 500 sheep remained on Mauna Kea.

 The State's policy position concerning feral sheep changed from one of eradication to one of management in 1950 because of hunters' desires for recreational game. Within a few years after the institution of the management program, the sheep population swelled to 3,500. However, past damage to the mamane forest had been so severe that the government realized it could not maintain such a large number of sheep without sacrificing the forest. Therefore, around 1960, the State initiated a program to breed feral sheep with Mouflon, or Mediterranean big horn, sheep in the hope that the resulting strain would be less harmful to the forest. The project was soon abandoned because of pressure from hunters, who wished to maintain pure populations of feral sheep.

 The State thereupon liberalized bag limits on sheep, which eventually resulted in a reduced population of 1,500 and some recovery of the forest. However, the decreased sheep population reduced hunter success, generating hunter

Defendants are fully aware of the destructive impact that the browsing game animals have had on the mamane-naio ecosystem.[10] The mamane leaves, stems, seedlings and sprouts, and, to a lesser extent, naio leaves, are an important food item in the diet of these feral sheep and goats. By consuming seedlings and shoots, the animals prevent regeneration of the forest, and thus bring about the relentless decline of the Palila's habitat.[11]

Plaintiffs do not deny defendants' contention that the forest has improved, compared to its condition 30 years ago. However, 30 years ago, the forest had not yet recovered from extensive damage caused by a population of feral sheep that was over 10 times greater than it is today, and the limited regeneration of the mamane forest that has occurred has been only in areas, such as roadways, lower elevations, and gulches, that are shunned by the feral sheep and goats because of human activity, or because they are beyond the reach of the animals. Destruction of the mamane-naio forest continues at the upper elevations, though perhaps not as rapidly as in the 1930's or 1940's. The sheep and goats cause the tree line to recede down the slopes of Mauna Kea because of the animals' tendency to

bed down above the tree line at night and to feed in flocks to about the 8,000-foot level during the day, thus denuding entire areas of mamane seedlings, shoots and other vegetation. As the tree line moves down the mountain, so do the sheep and goats.

Defendants argue that since regeneration of the forest would occur if small numbers of feral sheep and goats were allowed to remain, they should be permitted to undertake a program of "intensive management"[12] which would protect the forest while providing for hunter interests. However, looking realistically at the feasibility of such a program, I conclude that defendants' intensive management proposal would be an ineffective solution to regeneration of the forest because of inevitable hunter pressure to increase the feral sheep herd as long as any sheep remain in the forest, defendants' demonstrated susceptibility to that pressure, and the destructive effect on the forest of even a small number of sheep and goats due to their tendency to browse in flocks and denude an area totally.[13]

Furthermore, complete removal of the feral sheep and goats from the Palila's critical habitat is feasible. Sport hunters would still have opportunities to hunt these animals outside the critical habitat and oth-

---

pressure on defendants to close the hunting season to allow for a population increase. Through a manipulation of public hunting seasons between 1963 and 1973, defendants maintained the feral sheep population at 2,000 to 3,000.

In May 1979, the Board of Land and Natural Resources again suspended the sheep hunting season on the slopes of Mauna Kea because state census takers found only 600 sheep on the mountain, rather than the 1,100 they had expected. Honolulu Star-Bulletin, May 26, 1979 § A, at 2, col. 5.

10. *See* note 9, *supra.*

In 1976, the Chief of the Wildlife Branch, Division of Fish and Game, DLNR, and the Director of the Division approved a study of feral sheep on Mauna Kea which was authored by a wildlife biologist employed by DLNR. STATE OF HAWAII, ECOLOGY OF THE FERAL SHEEP ON MAUNA KEA (1976). Among other things, the study discusses the sheep's harmful effect on the mamane-naio forest.

11. There is a direct correlation between the ability of the mamane to regenerate and the presence of browsing sheep and goats. Exclo-

sure experiments conducted on Mauna Kea by defendants have shown that the mamane-naio forest and associated vegetation regenerate in areas once denuded by browsing where those areas have been fenced off to exclude the feral animals.

12. Defendants' feral sheep study, *see* note 10, *supra*, proposes a two-thirds reduction in the sheep population to a maximum number of 500 animals. The intensive management program would be accomplished through public hunting of the feral sheep and goats.

13. There are doubtless other factors, such as disease, drought, insects, frost, or competition from exotic grasses and weeds, which prevent the regeneration of the mamane forest. Feral pigs and Mouflon sheep (a study on the latter by the State is due for completion in 1980) may also contribute to the forest's decline. However, the Palila Recovery Team is convinced that stopping destruction of the forest by feral sheep and goats would solve 90 percent of the problem.

er game animals within the critical habitat.[14] Implementation of a removal program would be of relatively minor expense to defendants.[15] Because the Palila's critical habitat lies on publicly-owned land subject to defendants' jurisdiction, the program can be effected in a fairly short period of time through the manipulation of hunting seasons and bag limits and by humane killing of any remaining animals.

Defendants refuse to adopt a removal program.[16] The only concession by the Board of Land and Natural Resources has been to adopt in 1977, as a part of The Mauna Kea Plan,[17] a proposal to fence around portions of the mamane forest, within which there would be a year-round hunting season for feral sheep and goats.[18] To date, the defendants have taken no action to implement the fencing plan.

The Mauna Kea Plan also proposes that any game animals be eliminated only after further studies have been made; but no further studies need be done. Plaintiffs have shown (and defendants have produced no substantial evidence to the contrary) that the Palila requires all of its designated critical habitat in order to survive as a species and that the feral sheep and goats maintained by defendants are the major cause of that habitat's degradation.

## LEGAL CONSIDERATIONS

Under the Endangered Species Act, this Court has jurisdiction and venue over this action,[19] plaintiffs Sierra Club, National Audubon Society, Hawaii Audubon Society, and Alan C. Ziegler have standing to sue in their own names,[20] all conditions precedent to suit have been met,[21] defendants are among those defined

14. Feral sheep and goats exist elsewhere on the Island of Hawaii on publicly and privately owned land and would remain available for sport hunting. Hunting of Mouflon sheep, feral pigs and several species of game bird in the critical habitat would still be possible after removal of the feral sheep and goats.

15. The Palila Recovery Team estimates in the Plan that the removal program would cost a total of $8,000 through fiscal year 1986.

16. Plaintiffs apprised the Chairman of the Board of Land and Natural Resources, in a letter of June 1976, of the facts and law which formed the basis of their later complaint initiating this action and requested prompt implementation of appropriate programs to remove the goats and sheep permanently from [the Palila's critical habitat]." Defendants took no action on plaintiffs' request.

One year later, when the Board was considering the adoption of a Mauna Kea Master Plan, three divisions of DLNR, the then Chairman of the Board and the Deputy Director of DLNR all recommended that the Plan call for the elimination of feral sheep and goats from the mamanenaio forest within a three-year period, in order to maintain and improve the ecosystem and the endangered species found therein. The Board instead chose to continue to maintain the sheep and goats.

17. Department of Land and Natural Resources, State of Hawaii, the Mauna Kea Plan (1977).

18. The fencing plan is not a feasible alternative to removal of the feral sheep and goats. One year before the Board adopted The Mauna Kea

*Plan*, the Palila Recovery Team expressed its objection to the fencing plan in a letter to Chairman of the Board Christopher Cobb. Letter from Dr. Andrew J. Berger, Palila Recovery Team Leader, to Christopher Cobb (May 14, 1976). Dr. Berger, speaking for the Team, pointed out that the entire ecosystem, not just portions, must be preserved because of the Palila's seasonal movements. Dr. Berger also wrote that "[i]f sheep are already causing severe damage, it is reasonable to assume that the damage will become even more severe in those areas to which they are further being restricted by fencing." *Id.* at 1.

19. 16 U.S.C. § 1540(c) and (g).

20. Id., §§ 1532(8) and 1540(g)(1).

The Sierra Club is a private nonprofit corporation and the National Audubon Society and Hawaii Audubon Society are private nonprofit associations, all committed to protecting and conserving the earth's natural resources and wildlife. Alan C. Ziegler is a member of the Sierra Club and Hawaii Audubon Society and is the head of the Division of Vertebrate Zoology at the Bishop Museum in Honolulu, Hawaii. His duties at the museum include the study of Hawaiian birds, including the Palila.

21. 16 U.S.C. § 1540(g)(2)(A).

Plaintiffs gave formal written notice, in letters dated June 22, 1976, of defendants' alleged violations of the Act. These notices were sent to the Secretary of the Interior, the Chairman of the Hawaii Board of Land and Natural Resources, the Governor of Hawaii, and the Director of the U. S. Fish and Wildlife Service.

as "persons" subject to the Act,[22] and the controversy is ripe for adjudication.[23]

Yet defendants challenge the power of the United States to enforce the Endangered Species Act against them on behalf of the Palila.

 A Tenth Amendment argument is presented in a novel setting. The Palila exists in nature only on the slopes of the Island of Hawaii in the State of Hawaii. No federal lands or federal funds are involved.[24] Defendants rely on *Baldwin v. Montana Fish and Game Commission*, 436 U.S. 371, 98 S.Ct. 1852, 56. L.Ed.2d 354 (1978), as supporting exclusive state sovereignty over the fate of the Palila, but *Baldwin* is a weak reed upon which to lean in this situation as it wrestled with an entirely different question and contains dictum that may be cited on both sides of the issue.[25] The recent case of *Hughes v. Oklahoma*, —— U.S. ——, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979), reaffirmed the dictum found in *Baldwin* that a state's control over wildlife within its borders must yield to the federal commerce power.[26] More to the point is *Douglas v. Seacoast Products, Inc.*, 431 U.S. 265, 97 S.Ct. 1740, 52 L.Ed.2d 304 (1977), where the Supreme Court held that Congress had power under the Commerce Clause to regulate the taking of fish from state waters, thus preempting conflicting state laws.[27] Also relevant is *Missouri v. Holland*, 252 U.S. 416, 40 S.Ct. 382, 64 L.Ed. 641 (1920), where the Supreme Court held that the federal government may preempt

The present suit was filed on January 27, 1978, about 18 months after written notice of the violations.

**22.** 16 U.S.C. § 1540(g)(1)(A) and § 1532(8).

**23.** Defendants argue that the matter is not ripe for adjudication because the Board of Land and Natural Resources is still studying whether feral sheep and goats should be removed from the Palila's critical habitat and therefore there is no final agency determination to sue upon.

The jurisdiction of this Court is not conditioned upon a final decision of a state agency; rather, it is conditioned upon defendants' violation of Section 9 of the Act, 16 U.S.C. § 1538, which prohibits the taking of endangered species. Defendants' present actions in deciding to leave the feral sheep and goats in the Palila's critical habitat are causing immediate injury to plaintiffs.

**24.** In other cases arising under the Act, the activities sought to be enjoined have involved significant federal participation. *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978) (dam project constructed by a wholly-owned public corporation of the United States), *National Wildlife Federation v. Coleman*, 529 F.2d 359 (5th Cir.), *rehearing denied*, 532 F.2d 1375, *cert. denied*, 429 U.S. 979, 97 S.Ct. 489, 50 L.Ed.2d 587 (1976) (federally-funded interstate highway project), *Sierra Club v. Froehlke*, 534 F.2d 1289 (8th Cir. 1976) (federally-funded dam project). *See also Kleppe v. New Mexico*, 426 U.S. 529, 96 S.Ct. 2285, 49 L.Ed.2d 34 (1976) (held, the Wild Free-Roaming Horses and Burros Act was a constitutional exercise of Congress' power under the Property Clause as applied to wild horses and burros residing on federally-owned lands within a state).

**25.** The state hunting license law which the Supreme Court upheld in *Baldwin* existed in the absence of conflicting federal regulations or federally-protected interests. Although affirming the remaining vitality of the state ownership doctrine as expressive of "the importance to its people that a State have power to preserve and regulate the exploitation of an important resource," 436 U.S. at 386, 98 S.Ct. at 1861, the Court noted the limits to the doctrine when it stated:

The fact that the State's control over wildlife is not exclusive and absolute in the face of federal regulation and certain federally protected interests does not compel the conclusion that it is meaningless in their absence. *Id.*

**26.** *Hughes* as applied to the present case is dictum because there is no present interstate movement of the Palila. In *Hughes*, the Supreme Court held that a state statute prohibiting the out-of-state shipment of certain fish was repugnant to the Commerce Clause. The Court expressly rejected the traditional notion that wildlife within a state was "owned" by the state and thus beyond the reach of Congress' commerce power. The commerce power was at its strongest in the *Hughes* case because the fish were actually moved interstate.

**27.** *Seacoast Products* is also dictum. The State of Virginia had sought to regulate fish which moved during their life cycle without regard to state boundaries and which could not be regulated by each state in which they were found without creating a "Balkanization of interstate commercial activity that the Constitution was intended to prevent." 431 U.S. at 286, 98 S.Ct. at 1752. The Palila, however, remains within the confines of one state.

state control over wildlife under federal legislation implementing a Migratory Bird Treaty between the United States and Great Britain.[28]

The Endangered Species Act recites that "the United States has pledged itself as a sovereign state in the international community to conserve to the extent practicable the various species of fish or wildlife and plants facing extinction, pursuant to" several listed treaties and "other international agreements," 16 U.S.C. § 1531(a)(4). Among the listed treaties are "the Migratory and Endangered Bird Treaty with Japan,"[29] and "the Convention on Nature Protection and Wildlife Preservation in the Western Hemisphere."[30]

Article IV of the United States-Japan treaty contains provisions relating to "birds which are in danger of extinction" and states that "both contracting parties agree that special protection is desirable for the preservation of species or subspecies of birds which are in danger of extinction." 25 U.S.T. at 3334.[31] Article VI obligates each contracting party to "endeavor to take appropriate measures to preserve and enhance the environment of birds protected" under Article IV. *Id.* at 3335. Attached to the treaty as a "related note" is an exchange of correspondence between the Embassy of Japan and the United States Department of State containing lists of bird species that are within the coverage of Ar-

ticle IV. *Id.* at 3375. The United States list includes the Palila. *Id.* at 3382.

The Western Hemisphere Convention likewise promises protection of "all species and genera of . . . native flora and fauna, including migratory birds, in sufficient numbers and over areas extensive enough to assure them from becoming extinct through any agency within man's control," 56 Stat. at 1356; provides that the contracting governments "agree to adopt, or to propose such adoption to their respective appropriate lawmaking bodies, suitable laws and regulations for the protection and preservation of flora and fauna within their natural boundaries, but not included in the national parks, national reserves, nature monuments or strict wilderness reserves," *id.* at 1362; and binds the contracting governments to "adopt appropriate measures for the protection of migratory birds of economic or aesthetic value or to prevent the threatened extinction of any species." *Id.* at 1364. Article VIII declares that the protection of species listed in the Annex to the Convention is "of special urgency and importance" and that these species "shall be protected as completely as possible." *Id.* at 1366. The Palila is named in the 1970 list of endangered species prepared by the United States Department of the Interior to be included in the Annex.[32]

We need not enter into the debate whether a treaty is ever self-executing, that is, whether a treaty becomes part of the "su-

---

28. The pronouncements of *Holland* dealt with migratory birds and must therefore also be considered dictum when applied to the nonmigratory Palila.

29. Convention for the Protection of Migratory and Endangered Birds, March 4, 1972, United States-Japan, 25 U.S.T. 3329, T.I.A.S. No. 7990.

30. Convention on Nature Protection and Wildlife Preservation in the Western Hemisphere, October 12, 1940, United States-Other American Republics, 56 Stat. 1354, T.S. No. 981.

31. The fact that Article III of the treaty deals separately with migratory birds strongly suggests that the treaty was intended to protect both migratory and nonmigratory birds.

 The treaty also deals specifically with bird species inhabiting island environments. The Preamble to the treaty states "that island envi-

ronments are particularly susceptible to disturbance, that many species of birds of the Pacific Islands have been exterminated, and that some other species of birds are in danger of extinction. . . ." 25 U.S.T. at 3331. Article VI obligates the parties to protect bird species by refraining from taking measures "which could disturb the ecological balance of unique island environments." *Id.* at 3335.

32. Department of the Interior, List of Species to be Included for the United States of America in the Annex to the Convention on Nature Protection and Wildlife Preservation in the Western Hemisphere (attachment to letter from Leslie L. Glasgow, Assistant Secretary of the Interior, to William P. Rogers, Secretary of State, October 20, 1970).

preme law of the land"[33] without implementing legislation. Here, Congress has acted.[34] Nor need we enter into a general discussion as to whether there are any limits to the treaty-making power. The precise question is whether "what an act of Congress could not do unaided, in derogation of the powers reserved to the States, a treaty cannot do." *Missouri v. Holland,* 252 U.S. at 432, 40 S.Ct. at 383. That question was answered in plaintiffs' favor in *Holland.*[35]

The Endangered Species Act also recites that endangered "species of fish, wildlife, and plants are of esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people." 16 U.S.C. § 1531(a)(3). Does this declaration raise the status of the Palila to that level of national concern that invokes the power of Congress to regulate commerce with foreign nations, and among the several states, and with the Indian tribes?[36] *TVA v. Hill,* 437 U.S. 153, at 174–187, 98 S.Ct. 2279, 57 L.Ed.2d 117, 98 S.Ct. 2279 (1978), details the legislative history and importance of the Act. Congress has determined that protection of any endangered species anywhere is of the utmost importance to mankind,[37] and

**33.** The Supremacy Clause expressly states that "[a]ll Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; . . ." U.S.Const. art. VI, cl. 2.

**34.** "The purposes of this chapter are to provide a means whereby the ecosystems upon which endangered species . . . depend may be conserved . . . and to take such steps as may be appropriate to achieve the purposes of the treaties and conventions [set forth in § 1513(4)]." 16 U.S.C. § 1531(b).

**35.** In upholding the validity of the treaty, the Supreme Court wrote:

It is obvious that there may be matters of the sharpest exigency for the national well being that an act of Congress could not deal with but that a treaty followed by such an act could, and it is not lightly to be assumed that, in matters requiring national action, "a power which must belong to and somewhere reside in every civilized government" is not to be found.

252 U.S. at 433, 40 S.Ct. at 383 (citation omitted).
The Supreme Court concluded that the state's Tenth Amendment claim of title to migratory birds within its borders must give way to the national interest in protecting the birds because [w]ild birds are not in the possession of anyone; and possession is the beginning of ownership. The whole foundation of the State's rights is the presence within their jurisdiction of birds that yesterday had not arrived, tomorrow may be in another State and in a week a thousand miles away. . . .

Here a national interest of very nearly the first magnitude is involved. It can be protected only by national action in concert with that of another power. The subject matter is only transitorily within the State and has no permanent habitat therein. But for the treaty and the statute there soon might be no birds for any powers to deal with.

*Id.* at 434–435, 40 S.Ct. at 384.
The Court having determined that the treaty was a valid exercise of the federal government's treaty-making power, "there can be no dispute about the validity of the statute [implementing the treaty] under Article I, § 8, as a necessary and proper means to execute the powers of the Government." *Id.* at 432, 40 S.Ct. at 383.

The State of Hawaii has no more a claim of title to nonmigratory wild birds within the state than migratory. The Palila is free to roam wherever it pleases and can quit the confines of the state tomorrow for a distant abode over which the state has no jurisdiction. The Japan and Western Hemisphere treaties and the Act itself clearly recognize that protection of the Palila as an endangered species is a national interest of the first magnitude.

**36.** U.S.Const. art. I, § 8.

**37.** In *TVA v. Hill,* 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978), the Supreme Court noted:

The legislative proceedings in 1973 are, in fact, replete with expressions of concern over the risk that might lie in the loss of *any* endangered species. [Footnote omitted.] Typifying these sentiments is the report of the *House Committee on Merchant Marine and Fisheries* on H.R. 37, a bill which contained the essential features of the subsequently enacted Act of 1973; in explaining the need for the legislation, the report stated:

"*The value of this genetic heritage is, quite literally, incalculable.*

"From the most narrow possible point of view, *it is in the best interests of mankind to minimize the losses of genetic variations.* The reason is simple: they are potential resources. They are keys to puzzles which we cannot solve, and may provide

that the major cause of extinction is destruction of natural habitat.[38] In this context, a national program to protect and improve the natural habitats of endangered species preserves the possibilities of interstate commerce in these species and of interstate movement of persons, such as amateur students of nature or professional scientists who come to a state to observe and study these species, that would otherwise be lost by state inaction.[39]

I am therefore of the opinion that the Tenth Amendment does not restrict enforcement of the Endangered Species Act, both because of the power of Congress to enact legislation implementing valid trea-

> answers to questions which we have not yet learned to ask."
>
> . . . . .
>
> H.R.Rep. No. 93-412, 93d Cong., 1st Sess., pp. 4-5 (1973). (Emphasis added.)
> 437 U.S. at 177-178, 98 S.Ct. at 2293.

**38.** *TVA v. Hill,* 437 U.S. at 179, 98 S.Ct. 2279, *citing* 1973 House Hearings 236 (statement of Associate Deputy Chief for National Forest System, Dept. of Agriculture); *id.* at 241 (statement of Director of Mich. Dept. of Natural Resources), *id.* at 306 (statement of Stephen R. Seater, Defenders of Wildlife); Lachenmeier, The Endangered Species Act of 1973: Preservation or Pandemonium?, 5 Environ.Law 29, 31 (1974).

**39.** In *Brown v. Anderson,* 202 F.Supp. 96 (D.Alaska 1962), a three-judge district court overturned an Alaska statute closing certain fishing areas to nonresident fishermen, but not to residents, on the grounds that the statute unduly burdened the interstate movement of nonresident fishermen. The case has been cited as indirect support for the proposition that federal power over wildlife derives from the interstate movement of persons utilizing or studying wildlife. BEAN, THE EVOLUTION OF NATIONAL WILDLIFE LAW, 32-33 (Council on Environmental Quality, 1977).

**40.** It is also possible that Congress can assert a property interest in endangered species which is superior to that of the state. *Cf., Kleppe v. New Mexico,* 426 U.S. 529, 537, 96 S.Ct. 2285, 49 L.Ed.2d 34 (1976). Cases arising under the Property Clause have focused on Congress' power to make needful regulations respecting federally-owned lands. *Alaska v. Andrus,* 429 F.Supp. 958 (D.Alaska 1977) (under Property Clause, federal government retains the right to control wildlife management on federal lands);

ties and because of the power of Congress to regulate commerce.[40]

■ Defendants contend that there is no "taking" of the Palila within the meaning of the Act.[41] "Take" is defined in the Act to include "harm" which in turn is defined in regulations propounded by the Secretary of the Interior to include "significant environmental modification or degradation" which actually injures or kills wildlife. 50 C.F.R. § 17.3. The undisputed facts bring the acts and omissions of defendants clearly within these definitions. I conclude that there is an unlawful "taking" of the Palila.

■ One final question not raised by the parties is whether the defendants or either of them are immune from suit under

*Kleppe v. New Mexico, supra,* and cases cited therein.

However, in response to a challenge to the constitutionality of the Wild Free-Roaming Horses and Burros Act of 1971, the Supreme Court in *Kleppe* noted initially that "it is far from clear" that Congress cannot assert a property interest in regulated horses and burros found on public lands. 332 U.S. at 537, 96 S.Ct. 2285. The Court left that question open because the United States plaintiff made no claim of ownership to the horses and burros. Here, the question goes two steps beyond *Kleppe*; that is, whether Congress can assert a property interest over endangered species which reside on state-owned land. A state might argue that even though *Hughes v. Oklahoma,* —— U.S. ——, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979), discredits the state ownership notion, that case reaffirms the general notion that "a State have power to preserve and regulate the exploitation of an important resource." *Id.* at ——, 99 S.Ct. at 1736, *citing Toomer v. Witsell,* 334 U.S. 385, 402, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948). But where endangered species are concerned, national interests come into play. *See* 16 U.S.C. § 1531 (speaking to the national value of endangered species). The importance of preserving such a national resource may be of such magnitude as to rise to the level of a federal property interest.

**41.** Defendants argue that because the Palila population is increasing and the mamane-naio forest is regenerating despite the presence of the sheep, there is no "significant environmental modification or degradation," 50 C.F.R. § 17.3, which would constitute a "taking." The erroneous factual basis of their argument has already been discussed in the text of this decision and note 2, *supra.*

the Eleventh Amendment.[42] Under general principles enunciated by the Supreme Court, a state may not be sued by its own citizens or citizens of another state without its consent, but state officials may be sued to enjoin them from violating the United States Constitution or federal laws. *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed.2d 714 (1908).[43] The Supreme Court in *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), distinguished between prospective equitable relief, which was permissible even though it resulted in the expenditure of state funds ancillary to compliance,[44] and retroactive monetary restitution, which was impermissible because it was, in effect, an award of damages against the state.[45] Because the form of the injunction in *Edelman* was negative, the decision left open the question of whether affirmative equitable relief could be structured to be prospective compliance or would be considered a disguised form of damages against a state for an official's past non-compliance. The question was answered in *Milliken v. Bradley,* 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977), where the Su-

preme Court held that a decree compelling state defendants to pay one-half of the cost of compensatory educational programs to remedy past *de jure* segregation in public schools fit "squarely within the prospective-compliance exception reaffirmed by *Edelman . . .* [which] permits federal courts to enjoin state officials to conform their conduct to requirements of federal law, notwithstanding a direct and substantial impact on the state treasury." *Id.* at 289, 97 S.Ct. at 2762.[46] In *Quern v. Jordan,* —— U.S. ——, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979), the state defendants did not dispute the court's power to order affirmative equitable relief compelling defendants to mail to persons denied welfare benefits notices outlining state administrative remedies, despite the ancillary cost to the state.

Then, too, the Eleventh Amendment will not bar an action against the state itself where Congress has clearly manifested its intent to abrogate constitutional immunity and the state has impliedly consented to be sued. *Parden v. Terminal R. Co.,* 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964).[47]

**42.** Plaintiffs pray that the Court, *inter alia,* "enjoin the defendants from continuing to maintain any population of feral goats and sheep within the Palila's critical habitat on Mauna Kea" and compel defendants to prepare and implement a plan for complete and permanent removal of these feral animals from the Palila's critical habitat.

**43.** The major Supreme Court cases involving the Eleventh Amendment have dealt with injunctions against state officials to remedy violations of constitutional provisions, usually the Fourteenth Amendment. *E. g., Milliken v. Bradley,* 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977), *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed.2d 714 (1908). However, lower courts have held that the Eleventh Amendment is no bar to injunctions against state officials to remedy non-constitutional violations of federal laws. *Lewis v. Shulimson,* 400 F.Supp. 807 (E.D.Mo. 1975), *aff'd.,* 534 F.2d 794 (8th Cir. 1976) (Social Security Act), *Tullock v. State Highway Comm'n,* 507 F.2d 712 (8th Cir. 1974) (Uniform Relocation Assistance Act), *Taylor v. Lavine,* 497 F.2d 1208 (2d Cir. 1974) (Social Security Act).

**44.** The court explained that "[s]tate officials, in order to shape their official conduct to the

mandate of the Court's decrees, would more likely have to spend money from the state treasury than if they had been left free to pursue their previous course of conduct." 415 U.S. at 668, 94 S.Ct. at 1358.

**45.** In *Edelman,* the Supreme Court upheld a district court decree enjoining state officials from administering the federal-state welfare program in violation of the Fourteenth Amendment but overturned that portion of the decree which compelled the same officials to pay retroactive benefits to plaintiffs.

**46.** Defendants argue that the Supreme Court's decision in *Milliken* is distinguishable from the present case because *Milliken* involves a Fourteenth Amendment violation and is, therefore, within the Fourteenth Amendment exception to the Eleventh Amendment carved out in the case of *Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976). However, the Supreme Court in *Milliken* explicitly refrained from addressing the issue of whether the Fourteenth Amendment "works a *pro tanto* repeal of the Eleventh Amendment." 433 U.S. at 291, note 23, 97 S.Ct. at 2762.

**47.** *Parden* dealt with state waiver of immunity in a suit for retrospective money damages. The rule regarding state consent to suit also

Congress has the authority to abrogate state immunity in the exercise of the powers granted to it under the Constitution. See id.[48] The "threshold fact of Congressional authorization" is found where a Congressional enactment "by its terms authorize[s] suit by designated plaintiffs against a general class of defendants which literally include[s] States or state instrumentalities." Edelman v. Jordan, 415 U.S. at 672, 94 S.Ct. at 1360. Accord, Fitzpatrick v. Bitzer, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976). Where the statute is silent, Congressional authorization can also be found where the statute's legislative history focuses "directly on the question of state liability," Quern v. Jordan, —— U.S. at ——, 99 S.Ct. at 1141, (quoting Hutto v. Finney, 437 U.S. 678, 698, n. 31, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978)), or where the statute would be rendered meaningless with respect to states if liability were not imposed. Quern v. Jordan, supra.

Here, Congress has spoken clearly. Section 11(g) of the Act, 16 U.S.C. § 1540(g), expressly authorizes private citizens to bring suit enjoining a general class of defendants who violate the Act, including

"the United States and any other governmental instrumentality or agency (to the extent permitted by the eleventh amendment to the Constitution) . . . ."

The statutory reference to the requirements of the Eleventh Amendment does not mitigate the force of § 11(g). That reference is most sensibly construed as limiting the scope of injunctive relief against the state, so as to bar equitable relief tantamount to money damages. Edelman v. Jordan, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974).[49] To interpret the reference to the Eleventh Amendment as creating a blanket sovereign immunity exception to the private enforcement of the Endangered Species Act would seriously impair the achievement of the broad Congressional purposes underlying the Act[50] and would lead to a right without an effective remedy. Parden v. Terminal R. Co., 377 U.S. 184, 190, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964).[51]

Where Congress has legislatively abrogated sovereign immunity, a state's waiver of immunity and consent to be sued will be implied from its participation in activities covered by the Congressional legislation. Parden v. Terminal R. Co., supra.[52] Thus,

applies where the suit against the state is one for mandatory injunction. Alabama v. Pugh, 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978).

48. In holding that Congress had the power to subject the Alabama State Docks Department to suit under the Federal Employers' Liability Act, the Supreme Court in Parden stated:

By empowering Congress to regulate commerce, . . . the States necessarily surrendered any portion of their sovereignty that would stand in the way of such regulation. Since imposition of the FELA right of action upon interstate railroads is within the congressional regulatory power, it must follow that application of the Act to such a railroad cannot be precluded by sovereign immunity.

377 U.S. at 192, 84 S.Ct. at 1212.

49. The legislative history of § 11(g) gives us little guidance as to what Eleventh Amendment limitations Congress had in mind. The Senate report on the Act simply states that § 11(g) "permits, subject to certain conditions, private actions to enforce the provisions of [the] Act." Sen.Rep. No. 93-307, reprinted in 1973 U.S. Code Cong. & Admin.News, p. 2999.

50. 16 U.S.C. § 1531(b). See note 34, supra.

51. In the present case, unlike Parden, an alternative statutory remedy does exist in the form of enforcement by the various Secretaries. 16 U.S.C. § 1540(e). However, it is evident from the language of the Act that private suits are of paramount importance in enforcing the Act. The case of Employees v. Missouri Public Health Dept., 411 U.S. 279, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1973), where the Supreme Court refused to lift the sovereign immunity of the States under the FLSA, noting that alternative remedies to private enforcement were available, is distinguishable. The Court there wrote that "private enforcement of the Act was not a paramount objective," id. at 286, 93 S.Ct. at 1618, in light of the provisions in the Act terminating the right of an employee to sue once the Secretary of Labor has acted.

52. Edelman v. Jordan, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), where the Supreme Court held that the State of Illinois had not constructively consented to be sued "merely" by participating in the federal Aid to the Aged, Blind, or Disabled program and agreeing to administer federal and state funds in compliance with federal law, is distinguishable. In

in *Parden,* the Supreme Court held that the State had fully subjected itself to the federal commerce power, as exercised through the FELA, by owning and operating an interstate railroad. Similarly, the State consents to be sued under the Endangered Species Act when its wildlife management activities extend to areas regulated under the federal government's commerce and treaty-making powers. The State of Hawaii has actively attempted to participate in the conservation scheme contemplated under the Act by taking advantage of the "cooperative agreement" provisions of 16 U.S.C. § 1535.[53] In 1975, the Hawaii legislature enacted the Hawaii Endangered Species Act, L.1975 c. 65, codified at Haw.Rev. Stat. § 195D-1, *et seq.*[54] The stated purpose of the Act was .to "satisfy certain requirements of the federal 'Endangered Species Act of 1973' " in order

"to qualify Hawaii for a cooperative agreement with the U.S. Department of the Interior, making the State eligible for federal grant-in-aid funds and preclude federal preemption of Hawaii's authority in regulating endangered species." COMMITTEE ON JUDICIARY REPORT; STAND.COM.REP. NO. 757 (April 2, 1975).

The Hawaii Act was sent to the U.S. Department of the Interior for the Secretary's review pursuant to 16 U.S.C. § 1535(c).[55]

---

*Edelman,* the Court concluded that the threshold fact of express congressional authorization to sue the states is absent. Similarly, in *Employees v. Missouri Public Health Dept.,* 411 U.S. 279, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1973), the Supreme Court did not reach the question of whether Missouri had consented to suit under the Fair Labor Standards Act of 1938 by carrying on activities in the area of interstate commerce because the FLSA contained no "clear language that the constitutional immunity was swept away." *Id.* at 285, 93 S.Ct. at 1618.

53. 16 U.S.C. § 1535 provides in pertinent part:
*Cooperative agreements*
(c) In furtherance of the purposes of this chapter, the Secretary is authorized to enter into a cooperative agreement in accordance with this section with any State which establishes and maintains an adequate and active program for the conservation of endangered species and threatened species. . . . Unless he determines, pursuant to this subsection, that the State program is not in accordance with this chapter, he shall enter into a cooperative agreement with the State for the purpose of assisting in implementation of the State program. In order for a State program to be deemed an adequate and active program for the conservation of endangered species and threatened species, the Secretary must find, and annually thereafter reconfirm such finding, that under the State program—
 (1) authority resides in the State agency to conserve resident species of fish or wildlife determined by the State agency or the Secretary to be endangered or threatened;
 (2) the State agency has established acceptable conservation programs, consistent with the purposes and policies of this chapter, for all resident species of fish or wildlife in the State which are deemed by the Secretary to be endangered or threatened,
and has furnished a copy of such plan and program together with all pertinent details, information, and data requested to the Secretary;
 (3) the State agency is authorized to conduct investigations to determine the status and requirements for survival of resident species of fish and wildlife;
 (4) the State agency is authorized to establish programs, including the acquisition of land or aquatic habitat or interests therein, for the conservation of resident endangered species or threatened species; and
 (5) provision is made for public participation in designating resident species of fish or wildlife as endangered or threatened.

54. Much of the language of the Hawaii Endangered Species Act is taken from the federal act. The Hawaii act provides that federally-designated endangered and threatened species shall be deemed to be endangered and threatened species under the provisions of the Hawaii act. Haw.Rev.Stat. § 195D-4. The Hawaii act also prohibits any "person," including "any . . agent, department, or instrumentality . . . of any state," Haw.Rev.Stat. § 195D-2(g), from taking any endangered species "within this State." Haw.Rev.Stat. § 195D-4(e)(2).

55. The Department of the Interior returned the Act to DLNR in June, 1975, because it dealt inadequately with the state's land acquisition and conservation authorities, among other things, and was, therefore, insufficient to make Hawaii eligible for a cooperative agreement. Letter from Keith M. Schreiner, Associate Director, United States Department of the Interior, to Michio Takata, Director, Division of Fish and Game, Department of Land and Natural Resources (June 9, 1975). By a letter dated November 4, 1976, and attachments, the DLNR

Having bound itself under its own law to refrain from "taking" federally-designated endangered species, having sought to secure financial advantages under the Endangered Species Act, and having sought to retain managerial control over resident wildlife subject to the provisions of the Act, the State of Hawaii has impliedly consented to be sued under the Act.

## SUMMARY

The Palila is an endangered species under the Endangered Species Act.

The Endangered Species Act is a valid exercise of Congressional power pursuant to the treaty-making power and the Commerce Clause of the Constitution.

Defendants are violating the Endangered Species Act by maintaining feral sheep and goats in the Palila's critical habitat on the slopes of Mauna Kea on the Island of Hawaii.

Defendant Susumu Ono, in his capacity as Chairman of the Board of Land and Natural Resources, may be ordered to adopt a program at state expense designed to eradicate the feral sheep and goats from the Palila's critical habitat and may be enjoined from taking any action which has the effect of increasing or maintaining the existing population of feral sheep and goats in the Palila's critical habitat.

Defendant Hawaii Department of Land and Natural Resources may be similarly ordered and enjoined because the Endangered Species Act expressly abrogates sovereign immunity under the Eleventh Amendment and because the State of Hawaii has impliedly consented to be sued under that Act.

Counsel for the parties shall attempt to agree upon a form of judgment consistent with the foregoing for submission to the Court within 30 days or such further time as may be requested and allowed, or in the event of a failure to so agree, shall submit their respective forms of judgment within the time set.

submitted a new application for determination of eligibility for a cooperative agreement. Letter from Michio Takata to Lynn Greenwalt, Director, U.S. Fish and Wildlife Service (November 4, 1976). The attachments included a Bill for an Act Relating to the Conservation, Management and Protection of Endangered or Threatened Species of Wildlife or Plants, which proposed amendments to Haw.Rev.Stat. § 195D–1, et seq., to remedy the shortcomings in the Act noted by Associate Director Schreiner. In a letter dated February 14, 1977, Schreiner enumerated several items, including the status of the bill, which the State was requested to clarify before qualifying for a cooperative agreement. Letter from Keith M. Schreiner to Michio Takata (February 14, 1977). To date, the state has taken no further action on its application.